## ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY *v.* UNITED STATES.

### APPEAL FROM THE UNITED STATES COMMERCE COURT.

No. 590.  Argued December 1, 2, 1913.—Decided January 26, 1914.

Whatever transportation service or facility the law requires the carriers to supply they have the right to furnish.

Under § 15 of the Act to Regulate Commerce, as amended by the Hepburn Act, the carrier has not only the duty but the right to furnish all ice needed in refrigeration.

A carrier cannot be compelled to keep facilities for the benefit of shippers and the shippers allowed to furnish these facilities themselves.

The carrier cannot compel a shipper of fruit to have it refrigerated.

When ice is actually needed and used in transportation of fruit, it depends upon the circumstances of each case whether the icing is a part of preparation which can be done by the shipper or part of refrigeration which the carrier has the exclusive right to furnish.

Neither the carrier nor the shipper can insist upon wasteful or expensive service in transportation for which the consumer must ultimately pay.  In this regard the court will consider the interests of the public.

Loading the car, by whomsoever done, must be such as to prepare the freight for shipment, and a consignor may, in the absence of a regularly filed tariff covering this work, not only put perishable freight, such as fruit, in a car placed at his warehouse, but may do all other acts, including icing, necessary to fit the fruit for shipment and filling bunkers in the car with ice for its preservation.

Filing a tariff withdrawing a privilege to shippers affects a practice and a rule within the meaning of the Act to Regulate Commerce, and the Commission has power under § 15, as amended by the Hepburn Act, to determine after a hearing whether the new rate is unreasonable and if so what is just, and require the carrier to conform to the rates and practice prescribed by it.

An order of the Commission fixing carload rates apparently excluding any compensation for hauling the ice necessary for refrigerating, is not confiscatory when it appears that the rate for the fruit itself practically includes the rate for the ice.

In a suit based entirely on reasonableness of carload rates the issue of whether it discriminates against shippers of small lots will not be

considered when that issue is not presented on any assignment of error in this court.

What are proper rates for transportation and fair charges for facilities furnished and services rendered, and differences between carload and less than carload lots, are all rate-making matters committed to the Commission and within its discretion.

The courts have no power to fix rates or establish practices and cannot interfere with those fixed and established by the Commission except in cases where the orders are void. *Interstate Commerce Commission* v. *Un. Pac. R. R. Co.*, 222 U. S. 547.

204 Fed. Rep. 647, affirmed.

IN 1909, Associations, representing California fruit-growers, filed with the Commerce Commission complaints against numerous railroad companies attacking the freight and refrigeration charges on citrus fruit shipped from California to Eastern points. Much testimony was taken, from which it appeared that the orange crop amounted to about 50,000 cars per annum, of which the 20,000, shipped in warm weather, required some form of refrigeration in order to keep the fruit in condition for use at the end of the journey. At the close of the first hearing June 11, 1910, the Commission held (19 I. C. C. 148) that $1.15 per cwt. was a reasonable freight-rate on oranges. Other questions in the case were postponed until January 14, 1911, when the Commission made a report (20 I. C. C. 106) as to the reasonableness of the carriers' charges of $62.50 per car for refrigeration and $30 for services in shipments pre-cooled by the consignor.

The Commission found that in refrigeration by the carriers they furnished all the ice and performed all of the services, including re-icing en route. It found that there was a total of about 11 tons of ice furnished, but owing to the melting the average weight of ice hauled was 8,000 lbs., the freight on which to Chicago, was .25 per 100. It cost something to repair the bunkers, and the Commission recognized the right to include an additional sum to cover risk and profit.

The total revenue of $345.30 from such shipments was made up of the following items:

Freight on 27,200 lbs. of oranges @ $1.15... $312.80
Cost of 11 tons of ice................ $30.
Freight on 8,000 lbs. average weight of
    ice hauled @ .25................... 20.
Damage to bunkers.................. 5.
Sum to cover risk and profit.......... 7.50
                            62.50

Gross Receipt............................$375.30
Less cost of ice.........................  30.00

Freight and refrigeration charges...........$345.30

The Commission found that the charge of $62.50 for refrigeration services was reasonable.

It further appeared that the Government had conducted certain experiments with a view of determining whether an advantage would not be derived from pre-cooling the fruit before the bunkers were filled with ice. There was testimony that the carriers had reached the conclusion that if the fruit was pre-cooled before the movement of the car began, there would be a corresponding saving in the amount of ice needed in the bunkers. They accordingly had erected plants at which the fruit could be pre-cooled and included such pre-cooling service in the regular refrigeration charge of $62.50.

Certain shippers claimed that better results were obtained where the fruit was pre-cooled immediately after it was taken from the grove and before it was placed in the car. They therefore adopted a method in which the shipper chills the fruit, cools the car, furnishes the ice and fills the bunkers at a cost to himself of $32.50. The carrier for its services in connection with hauling such pre-cooled shipment charged $30, intending thereby to make the rates on pre-cooled fruits the same, whether the

pre-cooling was by the shipper or the carrier. In determining whether this $30 was a reasonable charge for service rendered by the carrier in hauling fruit pre-cooled by the shipper, the Commission said (20 I. C. C. 120) that no re-icing was necessary en route and that "it would be a liberal estimate to put the average weight of the ice during the entire journey at 5,000 lbs. For the hauling of this ice the carriers are entitled to fair compensation, as they are in the case of Standard Refrigeration." There is also an "expense in providing and keeping in repair the ice bunkers. . . . The carrier is, therefore, entitled to this additional cost, which is about $5 per car per trip one way." (20 I. C. C. 120.)

Where the fruit is pre-cooled by the shipper, the boxes are packed so much closer together that the load is one-sixth greater than in case of shipments pre-cooled and refrigerated by the carrier. The result is that the revenue from a car of fruit pre-cooled by the shipper would be—

Freight on 33,000 lbs. of oranges at $1.15 . . . . . . $379.50
Freight on 5,000 lbs. of ice at 25 cents per hundred          12.50
Damage to bunkers (and profit allowed?) . . . . . . .          7.50
                                                    _____
                                                      $399.50

or, $54 more than the revenue of $345.30 from a car pre-cooled and refrigerated by the carrier.

The Commission further said: "As bearing upon the reasonableness of the rate, the carriers showed the cost of the movement of these oranges per gross ton—that is, per ton of combined weight of car and of contents as compared with other articles—claiming that this was the true basis upon which to fix rates. So treating these pre-cooled shipments, it will be found that the carrier receives more per gross ton for handling the pre-cooled car than for either the ventilated or the refrigerated shipment. By every canon of rate-making which has been applied by carriers in the past, or which is relied upon by them now,

these pre-cooled shipments at the standard rate without additional compensation are better business than either the ventilated or the refrigerated movement. Clearly these growers who have devised and perfected this system of shipment, should not be compelled to pay for the privilege of using it more than the fair cost to the carrier of providing the additional facilities which are not included in the ventilated rate with a fair profit." 20 I. C. C. 121.

The report concluded as follows: "We are of the opinion that the present pre-cooling charges of the defendants of $30 per car are unjust and unreasonable, and that these charges should not exceed for the future $7.50 per car, but the defendants may, as a condition of making this charge, require that pre-cooled cars be loaded seven tiers wide and two tiers high, and may provide by their tariffs a proper minimum to accomplish this result, the amount of which would depend upon the length of the car." 20 I. C. C. 123.

The carriers, in obedience to this order, put in a tariff of $7.50 for pre-cooling services, but at once filed another tariff, effective July 1, 1911, reciting that "the privilege heretofore permitted to shippers of citrus fruit to pre-ice carload shipments is withdrawn, the carriers retaining and exercising the exclusive right and control of furnishing and doing all icing and refrigeration of citrus fruit in all cases where shipper does not specifically request or direct shipments to move solely under ventilation."

Immediately thereafter the orange-growers' associations filed proceedings to cancel this withdrawal tariff and to compel the carriers to continue to extend to shippers the old privilege of pre-cooling at the new rate of $7.50. At the hearing the evidence and reports of the Commission in the former case were stipulated into the record and, on April 8, 1912 (23 I. C. C. 267, 271), the Commission held that the shippers had the right to the pre-cooling

privilege and again ruled that $7.50 was a reasonable charge for the services rendered by the carriers.

The Railroad Companies then filed a petition in the Commerce Court attacking the original order of January 14, 1911 (fixing $7.50 as a reasonable charge on pre-cooled shipments) and the last order of April 8, 1912, (requiring the roads to permit pre-cooled shipments at that sum), contending that shippers had no right to ice the bunkers. They also insisted that the $7.50 rate was confiscatory and did not equal the $17.50, which the Commission itself had found to be the actual cost of services rendered in connection with pre-cooled shipments. The carriers, thereupon prayed that both orders should be annulled and set aside.

The Commerce Court (204 Fed. Rep. 647, 651) adopted the finding of the Commission that in pre-cooled shipments the revenue was $54 greater than in the Railroads' method of refrigeration, and concluded by saying that, in view of that fact, "we do not think that the petitioners have any valid complaint to make of the charge of $7.50 per car established by the Commission." It further held that under the facts appearing in the record, the shipper had the right to furnish the ice in pre-cooled shipments and thereupon it dismissed the petition. The case was then brought here by appeal.

*Mr. Gardiner Lathrop* and *Mr. F. H. Wood*, with whom *Mr. Robert Dunlap, Mr. T. J. Norton, Mr. A. S. Halsted, Mr. C. W. Durbrow* and *Mr. W. F. Herrin* were on the brief, for appellants:

The Commission has no power or authority to require carriers against their will to permit the shippers to perform any part of the refrigeration or transportation service, and the order of the Commission suspending and finally setting aside the amendment to the tariffs of the carriers withdrawing any permission or privilege theretofore

granted to shippers of pre-icing the carriers' cars was and is erroneous and invalid.

Shippers may pre-cool intended shipments in their own plants, but are not lawfully entitled to refrigerate the carriers' cars or perform a part of that service.

The carriers never claimed that the pre-cooling done by the shippers is a part of the transportation. But the icing of their equipment is a part of the transportation service.

For definition of refrigeration see 23 I. C. C. 267. See also *Int. Com. Comm.* v. *Louis. & Nash R. R. Co.*, 227 U. S. 88.

Furnishing of ice, loading it into bunkers of the car of the carrier which is under the control of the carrier, is a part of the refrigeration service. See *Matter of Charges*, 11 I. C. C. 129, 138; *Truck Farmers' Assn.* v. *Northeastern Ry.*, 6 I. C. C. 295, 316.

The railroad company is charged with the duty of refrigeration under the statute. *Florida Fruit Assn.* v. *Atlantic Coast Line*, 14 I. C. C. 476, 507; *Albree* v. *B. & M. R. R.*, 22 I. C. C. 303, 321; *Waxelbaum & Co.* v. *A. C. L. R. Co.*, 12 I. C. C. 178.

It was the same at common law. *Johnson* v. *Toledo &c. Ry.*, 133 Michigan, 596; 4 Elliott on Railroads, § 1474; 2 Hutchinson on Carriers, 3d ed., § 505.

Where duty has been imposed upon the carrier it is responsible for the safe transit of the shipments transported under such duty and takes the risk of the same being properly attended to, and cannot relieve itself from this liability or risk by contract with the shipper. *Taft* v. *Am. Exp. Co.*, 133 Iowa, 522; *New York &c.* v. *Cromwell*, 98 Virginia, 227; *In re Charges*, 11 I. C. C. 129, 138; *St. Louis &c. Ry.* v. *Renfroe*, 82 Arkansas, 143; *St. Louis &c. Ry.* v. *Jackson*, 55 Tex. Civ. App. 407; *McLean* v. *Gulf &c. Ry.*, 55 Tex. Civ. App. 130; *M., K. & T. Ry.* v. *McLean*, 55 Tex. Civ. App. 130.

See also the obligation imposed by the Carmack Amendment to § 20 of the Interstate Commerce Act.

The burden, responsibility and liability having been placed upon the carrier under the common law, and later by express statute, the carrier cannot be denied the right to perform the entire transportation service in order that it may make certain that the shipment will be carried in such a manner as will insure its safe transit and delivery.

The shipper is not legally entitled to perform any part of refrigeration without the carrier's consent.

Such duties as are imposed upon it, either by common or statute law, the carrier must discharge and perform either directly or through the instrumentality of some agency, and as it is responsible for the performance, and has imposed upon it the risk of proper performance, it may select its own agency therefor. *Refrigeration of Fruit*, 11 I. C. C. 129, 137.

Agency is a matter of contract and the Commission has not the power to impose such contracts upon carriers. *L. & N. R. R. Co.* v. *West Coast Co.*, 198 U. S. 483, 497; *Central Stock Yards Co.* v. *L. & N. R. R.*, 192 U. S. 568.

The carriers in this case were and are prepared to pre-cool shipments in cars. If they are lacking in proper appliances or fail to discharge the obligations, the shipper's right to relief is found in the courts because the Commission has not been vested with judicial power to determine these questions or to enforce the shipper's rights in these respects. *Int. Comm. Comm.* v. *Nor. Pac. Ry.*, 216 U. S. 538.

Pre-icing as well as icing the car is a part of transportation. There is no more right in the shipper to pre-ice or re-ice a car of the carrier and thus furnish a part of the transportation service than there is to demand that the carrier accept and use the cars of the shipper and make allowance therefor. *Int. Comm. Comm.* v. *Diffenbaugh*, 222 U. S. 42, 47; *Cons. Forwarding Co.* v. *Southern Pac.*

*Co.,* 9 I. C. C. 182, 197, 206; *In re Transportation,* 10 I. C. C. 360, 374; *Matter of Charges,* 11 I. C. C. 129, 138.

A shipper cannot force his own car or equipment upon the carrier without the carrier's consent and demand an allowance therefor. *Central Stock Yards Co.* v. *Louis. & Nash. Ry. Co.,* 118 Fed. Rep. 113; *S. C.,* 192 U. S. 568.

If these services are necessary in the refrigeration of the car, the law enjoins upon the carrier the obligation of furnishing them and imposes upon the carrier the obligation of answering to the shipper in the event the services are not properly performed. 1 Wyman, Pub. Serv. Corps., § 796, p. 669, note 1; *Atlantic Coast Line* v. *Geraty,* 166 Fed. Rep. 10; *Calender Co.* v. *Chicago &c. R. Co.,* 99 Minnesota, 295; *Undell* v. *Ill. Cent. R. R. Co.,* 13 Mo. App. 254; *Mathis* v. *Southern Ry. Co.,* 65 So. Car. 271; *Chicago & A. R. Co.* v. *Davis,* 159 Illinois, 53; *International &c. Ry. Co.* v. *Welbourne,* 113 S. W. Rep. 780; *St. L., I. M. & S. R. Co.* v. *Cumbie,* 101 Arkansas, 172; *Pennsylvania R. R. Co.* v. *Orem,* 111 Maryland, 356; *McConnell Bros.* v. *Southern Ry. Co.,* 144 Nor. Car. 87. See, also, note to *St. Louis &c. Ry. Co.* v. *Renfroe,* 10 L. R. A. (N. S.) 317.

The Commerce Court had power to review the decision and order of the Commission although it may have involved an administrative ruling. Whether or not a given practice or regulation of the carrier is reasonable is a question of law for the ultimate determination of the courts in an appropriate proceeding. Here, however, there was simply involved the legal right of the carrier to insist upon itself performing the entire transportation service and to withdraw from certain shippers a privilege theretofore accorded to perform a part thereof with an allowance therefor.

Common carriers have the right to make reasonable rules and regulations for the conduct of their business, governing the use of their cars and the manner of receipt,

transportation, delivery and care of freight while in their custody, and there is a presumption that such regulations are reasonable. *Harp* v. *Choctaw &c. R. R. Co.*, 125 Fed. Rep. 445, 450; *Robinson* v. *B. & O. R. R. Co.*, 129 Fed. Rep. 753; *Platt* v. *Lecocq*, 158 Fed. Rep. 724, 730; 2 Hutchinson on Carriers, 3d ed., §§ 943, 1033, 1077.

The reasonableness of any rule or regulation of a carrier is a question of law to be determined by the court. *Pullman Co.* v. *Krauss*, 145 Alabama, 395; 40 So. Rep. 399; *Gregory* v. *C. & N. W. Ry. Co.*, 100 Iowa, 345; *Central of Georgia Ry.* v. *Motes*, 117 Georgia, 923; *Ill. Cent. R. R. Co.* v. *Whittemore*, 43 Illinois, 420, 423; *Vedder* v. *Fellows*, 20 N. Y. 126, 130; *Railroad Co.* v. *Fleming*, 14 Lea (Tenn.), 145.

The question resolves itself into one of law. The Commission has committed an error of law in rendering its decision, and has entered an order which transcends its power and authority. The court should have determined these questions of law as an original proposition and not have felt constrained to accept the conclusions, findings, and order of the Commission as final. *Ill. Cent. R. R. Co.* v. *I. C. C.*, 215 U. S. 452; *Int. Comm. Comm.* v. *Un. Pac. R. R. Co.*, 222 U. S. 541.

The $7.50 charge prescribed by the Commission as compensation to the carrier for refrigeration where the shipper is permitted to pre-ice is unreasonable, unlawful, arbitrary and confiscatory and contrary to the findings of the Commission.

Carriers are entitled to a reasonable profit for each particular service rendered. *Southern Ry. Co.* v. *St. Louis Hay Co.*, 214 U. S. 297; *Int. Comm. Comm.* v. *Stickney*, 215 U. S. 98; *Cotting* v. *Kansas City Stock Yards*, 183 U. S. 79, 93, 94.

The order of the Commission gives those shippers with cold storage plants an advantage over others by the difference between $7.50 and $30, or $22.50 on every car.

*Mr. Blackburn Esterline,* Special Assistant to the Attorney General, with whom *The Solicitor General* was on the brief, for the United States:

The findings of fact set forth in the report of the Commission put it beyond the power of the appellants to challenge the validity of its order. Their counsel advance elaborate arguments and the citation of numerous authorities on the respective functions of the Commission and the court. The whole evidence is also discussed. The respect due to the repeated decisions of this court forbids the counsel for the Government from entering into any discussion of those questions. The elaborate brief of the appellants fails to set forth any single, distinct and dominant proposition of law which the Commission erroneously decided. They have cleared the way for the affirmance of the judgment. *Interstate Commerce Commission* v. *Chicago, Rock Island & Pacific Railway Co.,* 218 U. S. 88, and other authorities.

The Interstate Commerce Commission found as a fact that "the filling of the bunkers with ice is a part of the preparation of the car for shipment, and not a part of the transportation service," and that "pre-cooling and pre-icing" is inseparable and one and the same thing. The appellants concede the right of the shippers to pre-cool the fruits and place them in the cars. The concession brings the case to an end, as there is no legal question for review.

The carriers, the shippers, the Commission, and the Commerce Court all treated "pre-cooling and pre-icing" as one and the same thing until after the Commission condemned the charge of $30 per car, and the Commerce Court denied the first motion for preliminary injunction. The carriers then took the position, for the first time, that pre-cooling and pre-icing are different and separable; that pre-icing is refrigeration, and refrigeration is transportation, which the carriers, under the Act to Regulate Com-

VOL. CCXXXII—14

merce, have the sole and only right to perform. This was an afterthought, suggested by the pressure and exigencies of the case. *Railway Co.* v. *McCarthy*, 96 U. S. 258, 267.

The carriers first established the "pre-cooling and pre-icing" privilege. It was not until after all hope of levying the extortionate charge of $30 per car was gone, that they sought to cancel the tariff, and raise these numerous objections to the practice, such as damage to, and wear and tear of, the cars; the inferior quality and irregular dimensions of the ice blocks; the lack of proper refrigeration; the irregularity of the shippers in pre-cooling and pre-icing; the necessity for extra icing during delays in transit; the alleged increase of damage claims resulting, and the experimental purposes for which the practice is said to have been installed. While the carriers were levying the extortionate charge of $30 per car, which would aggregate, on all shipments, approximately $800,000 a year, these groundless objections laid dormant. Had no complaint been filed, or had the Commission dismissed the complaint, or refused to interfere, no objection would ever have been raised by the carriers to the practice.

The Commission was dealing with loaded cars and the weight of the contents. The "pre-cooling and pre-icing" is the highest standard of refrigeration and the most efficient system ever devised. It brings more revenue per car to the carriers as a result of the difference in the loading than any other system. No equivalent is offered by the carriers. The allowance of $7.50 for the wear and tear on the bunkers is adequate.

The argument that the order of the Commission will result in gross discrimination against the small shipper has already been rejected. *Interstate Commerce Commission* v. *Chicago, Rock Island & Pacific Ry. Co.*, 218 U. S. 88.

*Mr. P. J. Farrell* for the Interstate Commerce Commission:

The order of January 14, 1911, is fully supported by the evidence contained in the record made by the parties in the proceedings before the Commission.

The charge of $7.50 covers only services of carriers in keeping ice bunkers in repair.

To vary charge of repairing ice bunkers according to variations in distances over which traffic is transported would be impracticable and improper.

The Commission's finding concerning cost to shippers of pre-cooling and pre-icing is fully supported by evidence upon which it is based.

The reasons advanced by counsel in support of their contention that the order is invalid are based upon an erroneous view concerning matters covered by the charge of $7.50.

The order of April 8, 1912, is not based upon an erroneous construction of the Act to Regulate Commerce.

Pre-icing can be done more economically and satisfactorily by shippers than by carriers.

Shippers, within certain limits, have control of the condition in which traffic may be delivered to carriers for transportation.

The cases cited in their brief by counsel for the carriers are inapposite.

Carriers cannot compel shippers to pay for refrigeration services they do not ask for and do not need.

The right of carriers to re-ice in order to protect themselves against damages which would otherwise result from delays en route is freely admitted.

The shippers' right to pre-ice does not depend upon carrier's view of result which will ensue if shippers avail themselves of such right.

To serve their own interests the carriers are seeking to compel shippers to adopt an unnecessarily expensive method of shipment.

The Hepburn Act did not make the pre-icing in question a part of transportation.

Such pre-icing is an indispensable element of the pre-cooling process.

If the Commission had permitted cancellation tariffs of carriers to become operative, shipments of fruit would have been thereby subjected to new rates in excess of those formerly in effect.

Carriers may not. render ineffective an order of the Commission by canceling tariffs voluntarily published and filed by them upon which the order is based.

In support of these contentions see *Int. Comm. Comm.* v. *Del.; Lack. & West. R. R. Co.*, 220 U. S. 235; *Int. Comm. Comm.* v. *Diffenbaugh*, 222 U. S. 42; *Investigation and Suspension of Certain Regulations*, 23 I. C. C. 267; *Pacific Coast Lumber Assn.* v. *Atchison &c. Ry. Co.*, 14 I. C. C. 154.

*Mr. William E. Lamb*, with whom *Mr. George E. Farrand*, *Mr. Rush C. Butler* and *Mr. Stephen A. Foster* were on the brief, for the Arlington Heights Fruit Company *et al.*, intervenors.

Mr. Justice Lamar, after making the foregoing statement of facts, delivered the opinion of the court.

There are many cases between shipper and carrier in which each insists that the other is bound to furnish service or facilities connected with the transportation of freight. The present record, however, presents an instance where both parties are contending for the privilege of supplying an article needed in the proper shipment of fruit—the consignor claiming that icing is a necessary part of the loading, which he is authorized to supply; while the carriers insist that icing is a part of refrigeration, by statute made transportation, which they are bound to provide and for which they are entitled to collect reasonable compensation. The determination of these conflict-

ing claims necessitates an examination of the two methods under which, in warm weather, oranges are shipped from California to the East.

In what is called Standard Refrigeration, the boxes, of the aggregate weight of 27,200 pounds, are so placed as to leave spaces between them wide enough to admit of a free circulation of air chilled by ice in the bunkers. Subsequently the carriers put in a system of pre-cooling, under which after the cars had been loaded they were taken from the point of shipment to Refrigerating Plants owned by the carriers, where whole trainloads are pre-cooled at one time by means of blasts of very cold air driven into the car through and around the boxes. At the end of three or four hours the fruit is sufficiently chilled, the bunkers are then filled with about 10 tons of ice, furnished by the carrier, and the train is started on its journey to the East—the bunkers being re-iced from time to time as needed at stations along the route. For this entire service the Commission held that the carrier's charge of $62.50 was reasonable.

A different method obtains where the icing of the car is done by the shipper at his own expense. In that class of cases the oranges are taken from the grove directly to a cold room having a temperature of about 33°F. There the boxes are allowed to remain for periods of from 24 to 48 hours, and until the fruit is chilled to the center. When thus pre-cooled, the boxes are ready for shipment. A refrigerator car is then placed on the track opposite the door of the cold room of the warehouse with which it is connected by a collapsible enclosed passageway, so arranged as to exclude the outside air, while at the same time allowing that from the cold room to enter and cool the interior of the car. Through this passageway the oranges are trucked from the warehouse to the car and, as they have been chilled to the center, the boxes are packed close together forming a solid mass weighing

33,000 lbs., with a temperature of about 35°F. The doors
and vents of the car are promptly and tightly closed, the
bunkers are immediately filled with unusually large cakes
of ice, in order to reduce the rate of melting, and the fruit
is then forwarded under a filed tariff which provides that
re-icing is unnecessary, and that the shipper will make no
claim for damage occasioned by failure to re-ice in transit.
For their services in connection with such pre-cooled ship-
ments the carriers were allowed to charge $7.50 but the
Commission refused to permit them to charge for the ice
needed to keep the fruit cool between warehouse and
destination.

1. This ruling is attacked by the appellants, who con-
tend that icing is a part of refrigeration, which the Hep-
burn Act [1] makes a part of the transportation they are
bound to furnish upon reasonable request. They insist
that in order to meet the duty, thus imposed by stat-
ute, they have been compelled at great expense to erect
immense plants where trainloads of fruit can be cooled
and where an enormous quantity of ice is manufactured
for refrigeration purposes. They argue that, being bound
to furnish all necessary icing and re-icing and having at
great cost prepared to furnish the supply, it is not only
just, but a right given by statute, that they should be al-
lowed to provide all needed icing or refrigeration at a rate
to be approved by the Commission.

Whatever transportation service or facility the law
requires the carrier to supply they have the right to fur-
nish. They can therefore use their own cars, and cannot
be compelled to accept those tendered by the shipper on

[1]. . . The term "transportation" shall include . . . all serv-
ices in connection with the receipt, delivery . . . ventilation, re-
frigeration or icing, . . . of property transported; and it shall be
the duty of every carrier , . . to provide and furnish such trans-
portation upon reasonable request therefor. (Act of June 29, 1906,
c. 3591, § 1, 34 Stat. 584.)

condition that a lower freight rate be charged. So, too, they can furnish all the ice needed in refrigeration, for this is not only a duty and a right, under the Hepburn Act, but an economic necessity due to the fact that the carriers cannot be expected to prepare to meet the demand, and then let the use of their plants depend upon haphazard calls, under which refrigeration can be demanded by all shippers at one time and by only a few at another.

This contention was sustained by the Commission, which recognized that "the shipper has no right to provide refrigeration himself today and call upon the railroad company for that service tomorrow. To permit such a course is to demoralize the service of the defendants and prevent them from discharging their duty with economy and efficiency. . . . It is the duty of the carrier to furnish refrigeration upon reasonable demand, and in so far as the furnishing of that refrigeration is a part of the service rendered by the carrier, the carrier may insist upon its right to furnish that service exclusively." 20 I. C. C. 116.

2. But of course this does not mean, that because the carriers have ice on hand, they can compel the shipper to have his fruit refrigerated, when, on account of the state of the weather or for other cause, he prefers to have it forwarded under ventilation only. When, however, ice is actually needed and is actually used, the question arises as to whether icing is a part of preparation which can be done by the shipper; or a part of refrigeration (transportation) which, by statute the carrier has the exclusive right to furnish.

To this question no answer can be given that will apply in all cases. For in the shipment of fruit, as in that of other articles, it is impossible to lay down a rule which definitely fixes what loading includes and by whom it must be done. Nor is there any consistent practice on this subject, since from reported cases it appears that the

claims of the parties are based rather on interest than on some definite principle. Sometimes the shipper, as here, insists on the right to load and provide necessary appliances. At other times he demands that such service and appliances be furnished by the railroad company. Conversely the carriers sometimes claim, as here, the right to furnish service and facilities, while in other cases insisting that one or both must be supplied by the consignor. *Cf. National Lumber Dealers Association* v. *Atlantic Coast Line*, 14 I. C. C. 154; *Schultz* v. *Southern Pacific*, 18 I. C. C. 234; *In re Allowance for Lining and Heating Cars*, 26 I. C. C. 681; 25 I. C. C. 497.

These inconsistent and conflicting demands serve to emphasize the fact that, before the haul actually begins, the right or duty of each party, where not absolutely fixed by statute, must be decided with reference to the special facts of each case.

As a general rule, the carrier loads all freight tendered in less than carload lots while the consignor loads in all cases where, for his convenience, the car is placed at his warehouse or on public team tracks. This practice has grown up not only because the work can be more satisfactorily performed by the owner, but also because it is impossible for railroad companies economically to load cars at private warehouses or on those tracks where vehicles of the consignor or consignee come and go at the direction of the owner. 25 I. C. C. 490.

3. But loading may involve more than the mere placing of the freight on the car, since the character of the shipment may be such as to require the furnishing and placing of stakes, racks, blocks and binders needed to make the transportation safe; or, the freight may be such as to require special covering, packing, icing or heating, in order to preserve the merchandise in condition fit for use at the end of the journey. Who is to furnish these needed facilities, may be quite as uncertain as who is to place the

freight on the car, and can only be determined by considering the character of the shipment, the place where the loading begins, and who can most economically perform the service required.

Neither party has a right to insist upon a wasteful or expensive service for which the consumer must ultimately pay. The interest of the public is to be considered as well as that of shippers and carriers—their rights in turn having been adjusted by a reduction in the rate, if the loading is done in whole or in part by the shipper; and by an increase in the rate where the loading is done in whole or in part by the carrier. But, by whomsoever done, the loading must be such as to fit the freight for shipment, and when—by statutory requirement, by valid order of the Commission, or by the carriers' voluntary act,—the car is placed at the consignor's warehouse to be loaded by the shipper, he may not only put the freight on the car but may do all other acts required to fit the freight for its proper shipment—at least, until under a tariff regularly filed, the carrier offers to do what is necessary to secure or preserve what has thus been placed on its car for transportation. The refrigeration and pre-cooling offered by the carrier to shippers of pre-cooled fruit was found not to be the equivalent of the method adopted by the shipper.

4. In the present case the carriers concede that in pre-cooling shipments the consignor had the right to take all of the steps for preparation except the last. They concede that he had the right to pre-cool the fruit, to pre-cool the car, to place the boxes on board the car, to stop the vents and seal the doors. But they deny that he could ice the bunkers, even though that was necessary to the complete preparation, or loading, needed in that particular class of shipments and without which the fruit would be damaged by the rise in temperature, occurring during the time the car is being hauled from the warehouse of the shipper to the icing station of the carrier. Such delay in

filling bunkers would nullify most of the advantage of the expensive chilling of fruit and car necessary in the pre-cooling shipments,—permitted, if not originally encouraged, by the carrier. The privilege was withdrawn—not because the railroad companies were in position to furnish the ice at the proper time and place, but solely because the Commission had reduced the carriers' charge on pre-cooled oranges from $30 to $7.50 per car.

The icing may have been so related to refrigeration as to authorize the carriers to render that service. But manifestly they could not be expected to build refrigerating plants near each warehouse; and, the carrier not being in a position to do such icing, the consignor had the same right to provide the necessary supply that he would have had to ice a shipment of fish, to furnish and place standards to secure lumber on an open car, or to fasten to the floor articles which otherwise might be damaged by the jerks and jolts of a moving train. In the absence, therefore, of the carriers' offer, under a filed tariff, to furnish ice at the time and place needed in pre-cooled shipments, or to substitute a service of equal value at practically the same cost, they had no right to prevent the consignor from filling the bunkers so as to fit the freight for proper transportation.

5. The tariffs, withdrawing the pre-cooling privilege after July, 1911, would have changed the practice, recognized by the carriers themselves and actually approved by the Commission's order fixing $7.50 for the carrier's services in connection with such practice. As the withdrawal "affected a practice and a rate," the Commission had power to cancel that tariff and to require the carriers to conform to the order establishing the $7.50 charge on pre-cooled shipments. Such an order was justified by the provisions of the Hepburn Act (34 Stat. 589), which authorizes the Commission, after a hearing, to determine whether rates, or practices affecting rates, are unreasonable, to determine what practice in respect to trans-

portation is just, and to require the carrier to conform to those prescribed by the Commission.[1]

6. The appellants insist, however, that even if the shippers are entitled to furnish the ice the carriers are entitled to pay for hauling it. They claim that the charge of $7.50 is confiscatory because it does not cover what the Commission found to be the actual cost of the carriers' pre-cooling service. They point to the fact that the rate of $1.15 per cwt. on oranges was found to be reasonable, without regard to the character of the shipment and whether the fruit moved under Ventilation, Standard Refrigeration or Pre-cooling Shipment,—additional sums being allowed for furnishing or hauling ice needed in transportation of the fruit. They admit that more revenue is derived from a carload of pre-cooled fruit, weighing 33,000 lbs. than from a car where the load weights 27,200, but insist that the greater revenue is because of a greater service rendered and a greater weight hauled. On the authority of *Int. Com. Comm.* v. *Stickney*, 215 U. S. 98, 105 they contend that the receipt of a fair return for carrying 33,000 lbs. of fruit affords no reason for compelling them to haul 5,000 lbs. of ice 2000 miles for nothing, when, as found by the Commission, the actual cost of the haul is $12.50.

The order does not show the items going to make up the $7.50 charge. In the brief for the Commission it was

---

[1] Sec. 15. The Commission is authorized . . . whenever, after a full hearing . . . it shall be of the opinion that any of the rates, or charges . . . for the transportation of persons or property . . . or that any regulations or practices . . . affecting such rates, are unjust or unreasonable, . . ., to determine and prescribe what will be the just and reasonable rate . . . and what regulation or practice in respect to such transportation is just, fair, and reasonable to be thereafter followed; and to make an order that the carrier shall cease and desist from such violation, . . . and shall conform to the regulation or practice so prescribed. (Act of June 29, 1906, c. 3591, § 4, 34 Stat., 584, 589.)

said to include $5 for damage to the bunkers and $2.50 for profit. And since the report shows that the carriers were also entitled to $12.50 for hauling the ice, a charge of only $7.50 for a $20.00 service would at first blush appear to be not only unreasonable but confiscatory. But the order is to be read in connection with the report of which it forms a part. When so read it is evident that the Commission did not intend to require the carriers to haul 5,000 lbs. of ice without reasonable compensation, but considered that the haul of the ice was so much a part of the haul of the pre-cooled freight, that the expense could properly be treated as included or absorbed in the rate on the fruit itself. *Cf. Farrar Co.* v. *N. C. & St. L.*, 25 I. C. C. 25; *Swift* v. *M. P. Ry. Co.*, 22 I. C. C. 385.

The cost of such haul was $12.50—equivalent to 3.8 on the 33,000 lbs. of oranges in a pre-cooled shipment, and as a mere matter of figures, it was immaterial to the carriers whether they were permitted to charge $1.11.2 on the fruit and $12.50 for the ice, or $1.15 on the fruit alone without any distinct charge for transporting the ice. In either event, the revenue received was more than that derived from a car of Standard Refrigeration without corresponding increase in cost.

7. The claim that the order modifies the established rate of $1.15 and reduces it to $1.11.2 in pre-cooled shipments, thereby discriminating against the small fruit-grower and those who forward under ventilation or under the carriers' method of refrigeration, is not an issue presented by any assignment of error in this record, even if the carriers were in position to make such a contention. *Int. Com. Comm.* v. *Chicago; Rock Island & Pac. Ry.*, 218 U. S. 88, 109. There is no claim in this case that such rate, thus distributed, is unreasonable.

8. What is a proper rate on fruit in pre-cooling shipments, or a fair charge for hauling necessary ice or rendering other transportation services are all rate-making

matters committed to the Commission. It may determine what shall be the difference in rate between carload and less than carload lots. It may decide whether the difference in revenue, due to a difference in method of loading, warrants a difference in the rate on carload shipments of the same article. It may prescribe the form in which schedules shall be prepared and arranged (§ 6) and may approve tariffs stating that the single rate includes both the line haul and accessorial services absorbed in the rate. Conversely, it may prescribe a tariff fixing a through rate which includes not only the haul of the fruit, but the haul of the ice necessary to keep the fruit in condition. All these are matters committed to the decision of the administrative body, which, in each instance, is required to fix reasonable rates and establish reasonable practices. The courts have not been vested with any such power. They cannot make rates. They cannot interfere with rates fixed or practices established by the Commission unless it is made plainly to appear that those ordered are void. *Int. Com. Comm.* v. *Union Pacific R. R.,* 222 U. S. 541, 547. No such showing is made in this case. The decree must, therefore, be

*Affirmed.*