## J. C. FAMECHON CO. v. NORTHERN PAC. RY. CO.

(District Court, D. Minnesota, Fourth Division. February 25, 1926.)

No. 1039.

1. **Commerce** ☞89.

Courts may not exert original authority over subjects primarily within jurisdiction of Interstate Commerce Commission.

2. **Commerce** ☞89.

Whenever rate, rule, or practice is attacked as unreasonable or discriminatory, preliminary resort must be had to Interstate Commerce Commission.

3. **Commerce** ☞89—Legality of rate depending on question of fact must be initially determined by Commerce Commission, though construction of tariff, in matter of law, is for courts.

Where legality of rate depends on a controverted question of fact, it must be determined initially by Interstate Commerce Commission, though construction of tariff not dependent on extrinsic evidence or disputed fact is question which court may consider in first instance.

4. **Carriers** ☞26.

That compensation for transporation service comprises two items, one designated rental, does not make it illegal as matter of law.

5. **Commerce** ☞85.

Form of rate schedule is for Interstate Commerce Commission, which may approve or disapprove splitting of charges.

**6. Commerce ☞89—Potato shipper's action to recover car rentals held not within court's jurisdiction.**

Court *held* without jurisdiction of action to recover rental charges paid by potato shipper for refrigerator cars in addition to line haul rate, involving fact question as to kind of equipment that carrier should have furnished, which was primarily for Interstate Commerce Commission.

In Equity. Suit by the J. C. Famechon Company against the Northern Pacific Railway Company. Bill dismissed.

Charles B. Elliott and George H. Smith, both of Minneapolis, Minn., for plaintiff.

Fred G. Dorety, B. W. Scandrett, and D. R. Frost, all of St. Paul, Minn., for defendant.

## Decision.

JOHN B. SANBORN, District Judge. From the admissions contained in the pleadings and the evidence adduced the court finds as facts:

(1) That the plaintiff is, and at all the times herein mentioned was, a corporation duly organized and existing and engaged in the business of shipping potatoes from various points in the state of Minnesota and other states to various places of destination in the Western, Southern, and other states. That the defendant is, and at all the times herein mentioned was, a corporation and a common carrier by railroad, subject to the act of Congress entitled "An act to regulate commerce," approved February 4, 1887, and amendments thereto (Comp. St. § 8563 et seq.).

(2) That plaintiff made the nine carload shipments of potatoes described in Plaintiff's Exhibits A to J, both inclusive, which exhibits are by reference made a part of these special findings. That said shipments originated at stations on the railroad of defendant, and were duly transported by defendant and connecting railway companies to their destinations. That plaintiff ordered from defendant, and used for the shipments, refrigerator or insulated cars.

(3) That the defendant, as initial carrier, received and transported all the shipments described in Plaintiff's Exhibits A to J, inclusive, upon the agreement and understanding that plaintiff would pay all lawful freight and other lawful charges on each shipment from point of origin to point of destination.

(4) That all the shipments described in Plaintiff's Exhibits A to J, inclusive, moved under tariffs that were applicable to said shipments, and which defendant and the connecting railway companies that participated in the transportation had lawfully and duly filed with the Interstate Commerce Commission, and published and posted, and said tariffs were the lawfully published and filed tariffs of the railway companies over the lines upon which said shipments moved. That the aforesaid tariffs named local, joint, and proportionate rates of transportation on potatoes in carloads in "cents per 100 lbs." from the point of origin to the point of destination of each shipment referred to in Plaintiff's Exhibits A to J, inclusive. That said amount in "cents per 100 lbs." is hereinafter referred to as the "line-haul rate." That said tariffs also published certain additional charges in cents per 100 pounds, effective on carload shipments during the "cold weather period," October 15th to the following April 15th, inclusive, for which, if the shipper elected to apply for and to load a car under "carriers' protective service," the carriers undertook to "furnish artificial heat (when required) as protection against frost, freezing, or overheating, but only within the territory covered by the table of charges." That it was provided that charges shown in said section upon "carriers' protective service" were "in addition to and independent of freight rates." That said tariffs also provided that between the dates October 15th to the following April 15th, inclusive, shippers might apply for and load cars to be shipped under "shipper's protective service," and for cars so ordered and loaded it was provided:

### "Shipper's Protective Service.

"(A) Shippers to Provide False Floors, Stoves, Fuel, etc.: When in the judgment of the shippers it is necessary (on account of the nature of the commodity and climatic conditions) to use temporary false flooring or lining or both, or stove (including fuel or fittings for same), they must be furnished and installed by the shipper and at his expense. Heaters and stoves must be of suitable design as to safety, and must be securely fastened and braced. * * *

"(B) Prewarming Cars: Carriers will not prewarm cars which are to be handled under this rule.

"(C) Attention to Fires: When a portable stove or heater is installed in car, the shipper must send a caretaker from point at which such stove or heater is installed to look after fires at all points, including destination. * * *

"(D) Housing: Cars moving under this rule will not be placed in carrier's warming

houses or roundhouses at any point, including destination, for protection of contents against cold, nor for the removal of frost from the lading."

That said tariffs also provided for the free transportation, going and returning, of each attendant in charge of one consignment (consisting of one or more carloads) between points within the limits of the option territory. That said tariffs also made provision for the return movement to shipper, if desired, of stoves or heaters, fittings therefor, false floors or wooden linings which had been used in the movement of freight; the published charge for the return movement being "one-half of fourth class freight rate." That, if the shipper ordered and used a box car under "shipper's protective service," the tariff charge was the line-haul rate above described. That, if the shipper selected "shipper's protective service," and ordered and used a refrigerator or insulated car, the aforesaid tariffs published a charge of $5 per car per trip in addition to the line-haul rate. That the aforesaid tariffs made provision for said charge in an item that read:

"When shipper uses a refrigerator or other insulated car, during the period from October 15th to the following April 15th, both dates inclusive, for loading with potatoes or other vegetables classified as taking class 'C' rates in Western classification, in straight or mixed carloads, to be heated by him or to move without heat, a charge of $5.00 per car per trip will be made for the use of the car."

(5) That the Interstate Commerce Commission, in proceedings duly instituted and after investigations, has found said tariff rule quoted in the foregoing finding not unreasonable, not unjust, and not otherwise unlawful, and that the plaintiff, prior to the commencement of this action, had made no application to said commission to have said rule suspended or set aside on the ground that it was unreasonable, unjust, or unlawful.

(6) That the plaintiff paid to the defendant all its lawful freight and other lawful charges on each shipment described in Plaintiff's Exhibits A to J, inclusive, from point of origin to point of destination, including the $5 rental charge for the use of the refrigerator or other insulated car in which such shipments were made.

As a conclusion of law, the court finds That the defendant is entitled to a judgment of dismissal, and to its costs and disbursements herein.

Let judgment be entered accordingly.

In so far as these findings constitute a denial of the requests for instructions made by the plaintiff and the defendant, or an overruling of objections made by either to the requests of the other, they may have exceptions thereto.

Memorandum.

The plaintiff brings this action to recover the rental charges paid by it for refrigerator cars used in making nine shipments of potatoes, which originated in Minnesota; the defendant being the initial carrier. These charges were in accordance with the published and posted tariffs of the defendant. Prior to 1914 no rental charge was exacted by the defendant for the use of a refrigerator car. The charge was first proposed in the year 1913, but was withheld until the year 1914. Upon its being filed and posted, its reasonableness was called into question, and it was suspended by the Interstate Commerce Commission pending an investigation. The decision of the commission is found in Rental Charges for Insulated Cars, 31 Interst. Com. Com'n R. 255. The commission says:

"The record indicates that the refrigerator car is generally regarded as the most satisfactory car for the movement of potatoes; it keeps out the cold in winter and the heat in summer; the potatoes do not shrivel up as they do when shipped in a stock car, and the ventilators permit ventilation while preventing the stealing of the contents. When obtainable, these cars are used almost exclusively during the cold months."

"The record in this proceeding shows that in the beginning potatoes moved in box cars during the fall months and the rates were fixed on the basis of such movement; they now move largely in refrigerator cars and during the winter months. There is nothing of record to warrant the commission in finding that the proposed charge is either unjust, unreasonable or unduly discriminatory."

The reasonableness and legality of the charge or similar charges were considered by the Interstate Commerce Commission in the following cases: Rules Governing Transportation of Potatoes in Refrigerator Equipment, 34 Interst. Com. Com'n R. 255; North Pacific Fruit Distributors v. N. P. Ry. Co., 40 Interst. Com. Com'n R. 191; Hale Halsell Grocery Co. v. M., K. & T. Ry. Co., 42 Interst. Com. Com'n R. 491; Id., 45 Interst. Com. Com'n R. 523; Northern Potato Traffic Ass'n v. C. & A. R. Co., 44 Interst. Com.

Com'n R. 426; Gamble Robinson Commission Co. v. A. & B. Ry. Co., 50 Interst. Com. Com'n R. 324; Northern Potato Traffic Asso. v. C. & N. W. Ry. Co., 53 Interst. Com. Com'n R. 100; Perishable Freight Investigation, 56 Interst. Com. Com'n R. 449; Northern Potato Traffic Asso. v. Balt. & Ohio R. Co., 61 Interst. Com. Com'n R. 680.

In Perishable Freight Investigation, supra, at page 487, in discussing the difficulty of determining whether freight rates are "predicated upon box car movement," the commission states that in Rental Charges for Insulated Cars, supra, it found that the rates "were made originally upon the theory that the traffic would move in box cars," while in Northern Potato Traffic Ass'n v. C. & A. R. Co., supra, it discovered, upon a more complete record, that that was an error. It states: "The existing charges of this nature which we have approved seem to be based rather on the theory of discouraging unnecessary use of insulated cars than upon the theory of compensation, for in general they are applicable only during a portion of the year. See Northern Pacific Fruit Distributors v. N. P. Ry. Co., supra, and Northern Potato Traffic Ass'n v. C. & A. R. R. Co., supra. The similar charge proposed in rule 40, applicable throughout the year, and largely justified by its proponents as fair compensation for service rendered, is unsupported by evidence of cost, and is also fairly open to the criticism of protestants that it remains constant whatever the length of haul or time consumed en route."

The commission then lays down the rule that, "where insulated cars are ordinarily required for safe transportation throughout the year, or the greater part of the year, compensation should be secured through the line-haul rates. Where this is not the case, a special charge is preferable; but such a charge should be fairly proportioned to the extent and cost of the service furnished."

It is stated that this rule amounts to saying that no special charge should be imposed "when the line-haul rates are or should be predicated upon insulated car movement."

In Northern Potato Traffic Ass'n v. Baltimore & Ohio R. Co., supra, the commission calls attention to the rule above referred to, and says:

"We pointed out that the proposed charge was unsupported by evidence of cost and fairly open to the criticism that it remained constant whatever the length of haul or time consumed en route. The charge now under attack is subject to the same infirmities, and to the further criticism that it is assessed during the season when the evidence shows that insulated cars are usually necessary for safe movement and is not assessed during the portion of the year when other types of equipment can frequently be employed.

"But we are here considering this charge only in so far as it is applicable to certain long-haul movements, and it is a charge which we have passed upon and sustained in previous decisions. The burden of justifying it is not upon defendants. Having these circumstances in mind we are not persuaded, unsatisfactory as the charge is in certain respects, that it has been shown to be unreasonable by the evidence of record."

In 1921 the plaintiff brought an action similar to this in the state district court, and recovered a judgment, which was affirmed by the Supreme Court in the case of J. C. Famechon Co. v. Hines, Director General, 185 N. W. 941, 187 N. W. 974, 151 Minn. 9. Pursuant to stipulation, the trial judge had found that during the entire year a refrigerator or other insulated car was the only proper and suitable car in which to transport potatoes from Minnesota to other points. The court, following the rule of the commission in the Perishable Freight Investigation, supra, that the charge for the use of such a car should be included in the line-haul charge when required for safe transportation throughout the year, held that the rental charge was unlawful, and could therefore be recovered.

The plaintiff's theory is that the common-law duty of the defendant required it to furnish refrigerator or insulated cars for the shipment of potatoes, and that, that being true, nothing could legally be collected by it beyond the line-haul rate, although required by its tariff. It also contends that the court must find that the line-haul rate was predicated upon the use of refrigerator or insulated cars.

The defendant's position is that this court has no jurisdiction to determine the legality of the rental charge, because it involves questions which can only be considered and determined by the Interstate Commerce Commission.

If the validity of the rental charge depends upon what the court finds with reference to the unsuitability of a box car for the transportation of potatoes, it brings about a peculiar situation. The evidence upon that point is conflicting. It would support a finding that a box car was a suitable car during a portion of the year, and that an insulated car was the only suitable equipment during the periods of low or high tempera-

ture, or it would support a finding that at all times of the year an insulated or refrigerator car was the only suitable equipment. On this record, taking the view most favorable to the plaintiff, the court could properly determine that the charge was illegal. Upon another record made by another shipper in a similar case the court could find that the rate was legal. Both conclusions would be entitled to affirmance, so that it is conceivable that in the same circuit, upon different records, the charge might be declared both legal and illegal.

[1] The Supreme Court of the United States has taken the position that, for the preservation of the uniformity which it was the purpose of the Act to Regulate Commerce to secure, the courts may not as an original question exert authority over subjects which primarily come within the jurisdiction of the commission.

In the case of Texas & Pacific Ry. Co. v. American Tie & Timber Co., Ltd., 34 S. Ct. 885, 234 U. S. 138, 58 L. Ed. 1255, the question was as to whether the word "lumber" as used in the tariff included oak cross-ties. The question was left to a jury. With reference to that case, the Supreme Court, in Great Northern R. Co. v. Merchants' Elev. Co., 42 S. Ct. 479, 259 U. S. 293 (66 L. Ed. 943), said: "The only real question in the case was one of fact; and upon this question of fact 'the views of men engaged in the lumber and railroad business as developed in the testimony' were in 'irreconcilable conflict,' p. 146. As that question, unlike one of construction, could not be settled ultimately by this court, preliminary resort to the commission was necessary to ensure uniformity."

The situation in the case of Loomis v. Lehigh Valley R. R. Co., 36 S. Ct. 228, 240 U. S. 43, 60 L. Ed. 517, was similar. The shipper of grains, fruits, and vegetables requested the carrier to supply cars for loading. In order to load them to capacity, it was necessary that they should be equipped with grain doors or bulkheads, so that they might contain a load and enable unloading to be done without waste and inconvenience. The cars sent lacked the inside doors and bulkheads. The carrier refused to furnish them, and the shipper was obliged to do so and sought reimbursement. The tariff was silent. The question was not the construction of the tariff, but what character of equipment should be deemed reasonable. To determine that inquiry, the court held that preliminary resort to the commission must be had, because "an adequate consideration of the present controversy would require acquaintance with many intricate facts of transportation and a consequent appreciation of the practical effect of any attempt to define services covered by a carrier's published tariffs, or character of equipment which it must provide, or allowances which it may make to shippers for instrumentalities supplied and services rendered."

[2] There is, of course, no question but that, whenever a rate, rule, or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the commission. Texas & Pac. Ry. Co. v. American Tie & Timber Co., Ltd., supra; Texas & P. R. Co. v. Abilene Cotton Oil Co., 27 S. Ct. 350, 204 U. S. 426, 51 L. Ed. 553, 9 Ann. Cas. 1075; Robinson v. Baltimore & Ohio R. Co., 32 S. Ct. 114, 222 U. S. 506, 56 L. Ed. 288; Keogh v. C. & N. W. R. Co. et al., 43 S. Ct. 47, 260 U. S. 156, 67 L. Ed. 183.

In the latter case it was said: "The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." Davis, as Agent, etc., v. Portland Seed Co., 44 S. Ct. 380, 264 U. S. 403, 68 L. Ed. 762.

In the case of Great Northern Ry. Co. v. Merchants' Elevator Co., 42 S. Ct. 477, 259 U. S. 285, 66 L. Ed. 943, the court held that, where the rights of shipper and carrier depend entirely upon a legal construction of the tariff, involving no question of fact either in aid of the construction or in other respect, and no question of administrative discretion, the courts have jurisdiction without preliminary resort to the Interstate Commerce Commission. In that case Mr. Justice Brandeis makes the following statement:

"Whenever a rate, rule, or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the commission. Sometimes this is required because the function being exercised is in its nature administrative in contradistinction to judicial. But ordinarily the determining factor is not the character of the function, but the character of the controverted question and the nature of the inquiry necessary for its solution. To determine what rate, rule, or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the exaction of an unreasonable

or discriminatory rate is a judicial function. Preliminary resort to the commission is required alike in the two classes of cases. It is required because the inquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the commission. Moreover, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable; and such acquaintance is commonly to be found only in a body of experts. But what construction shall be given to a railroad tariff presents ordinarily a question of law which does not differ in character from those presented when the construction of any other document is in dispute.

"When the words of a written instrument are used in their ordinary meaning, their construction presents a question solely of law. But words are used sometimes in a peculiar meaning. Then extrinsic evidence may be necessary to determine the meaning of words appearing in the document. This is true where technical words or phrases not commonly understood are employed. Or extrinsic evidence may be necessary to establish a usage of trade or locality which attaches provisions not expressed in the language of the instrument. Where such a situation arises, and the peculiar meaning of words, or the existence of a usage, is proved by evidence, the function of construction is necessarily preceded by the determination of the matter of fact. Where the controversy over the writing arises in a case which is being tried before a jury, the decision of the question of fact is left to the jury, with instructions from the court as to how the document shall be construed, if the jury finds that the alleged peculiar meaning or usage is established. But where the document to be construed is a tariff of an interstate carrier, and before it can be construed it is necessary to determine upon evidence the peculiar meaning of words or the existence of incidents alleged to be attached by usage to the transaction, the preliminary determination must be made by the commission; and not until this determination has been made can a court take jurisdiction of the controversy. If this were not so, that uniformity which it is the purpose of the Commerce Act to secure could not be attained. For the effect to be given the tariff might depend, not upon construction of the language —a question of law—but upon whether or not a particular judge or jury had found, as a fact, that the words of the document were used in the peculiar sense attributed to them or that a particular usage existed."

[3] The rule would seem to be that, where the legality of a rate depends upon a controverted question of fact upon which different conclusions might be reached by judge or jury, it must be determined initially by the commission, but that, where a rate question such as the construction of a tariff does not depend upon extrinsic evidence or upon determination of a disputed fact, but is purely a question of law, it is for the court, because, if wrongfully decided, it can be corrected on appeal.

The Interstate Commerce Commission has thus far determined that the line-haul rate plus the rental charge for a refrigerator car does not produce an unreasonable, unjust, or discriminatory rate, where the car is used between October 15th and April 15th. It is probable that under the rule laid down by the commission in Perishable Freight Investigation, supra, the rental charge should have been absorbed in the line-haul rate, but there seems to be nothing in the law which absolutely required that that be done, and, if it was done, it is possible that the line-haul rate might have been increased.

[4] It cannot be said as a matter of law that, because the compensation exacted for the transportation service was divided into two items, the portion of it called rental charge was illegal. It was illegal if that item was already included in the line-haul rate. To determine that requires an investigation of facts.

[5] The form of the rate schedule is for the Interstate Commerce Commission. It can approve or disapprove the splitting up of the charge made by the carrier for transportation and other service. Atchison, Topeka & Santa Fé R. Co. v. United States, 34 S. Ct. 291, 232 U. S. 199, 58 L. Ed. 568; Texas & Pacific Ry. Co. v. Am. Tie & Timber Co., supra.

[6] I am satisfied that to determine the legality of the rental charge depends upon matters which should be considered by the Interstate Commerce Commission, and, for that reason, that the court has no jurisdiction. That being true, it is unnecessary to determine what kind of equipment the railroad company should have furnished for the transportation of potatoes, upon the use of what equipment the rate was based, or within what period actions upon claims of this character must be brought. If it shall eventually be determined that this is a case in which the plaintiff may resort to the court, such additional findings of facts as may be necessary can be made.