ALTON & S. R. R. et al. v. UNITED
STATES et al.
No. 2502-L.

District Court, N. D. California, S. D.
Feb. 9, 1931.

Elmer Westlake, of San Francisco, Cal., R. S. Outlaw, of Chicago, Ill., and James E. Lyons, of San Francisco, Cal., for petitioners.

E. M. Reidy, of Washington, D. C., for Interstate Commerce Commission.

Elmer B. Collins, Sp. Asst. to Atty. Gen., and Geo. J. Hatfield, U. S. Atty., of San Francisco, Cal., for the United States.

Paul E. Blanchard and Ross Dean Rynder, both of Chicago, Ill., for interveners Swift & Co. and another.

Allan P. Matthew, John O. Moran, and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., for interveners Pacific States Butter, Eggs, Cheese & Poultry Ass'n and others.

Allan P. Matthew, John O. Moran and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., and W. D. Gillis, Atty. Gen., of Idaho, for intervener Public Utilities Commission of Idaho.

Arthur T. George, Ira H. Rowell, and Roderick B. Cassidy, all of San Francisco, Cal., for intervener Railroad Commission of California.

Edson Abel, of San Francisco, Cal., for intervener California Farm Bureau Federation.

Before WILBUR, Circuit Judge, and ST. SURE and LOUDERBACK, District Judges.

WILBUR, Circuit Judge.

This proceeding was instituted by the petitioners to secure the annulment of an order of the Interstate Commerce Commission fixing the cost of icing for shipments of poultry and dairy products originating in the six western states. The action of the Interstate Commerce Commission was invoked by a petition attacking such rate filed by the Pacific States Butter, Egg, Cheese & Poultry Association. June 17, 1925. After elaborate hearings and presentations by that association, by the railroads, and by other interested parties, the Interstate Commerce Commission January 22, 1929, made the order now under attack to become effective May 9, 1929. In the hearing before the Interstate Commerce Commission, the 135 railroads, the petitioner therein, and other intervening shippers, petitioners herein, and the public utility rate-regulating bodies of the states of Washington and Idaho, were represented. Some of the parties who appeared before the Interstate Commerce Commission upon the hearing now appear in this court as plaintiffs, defendants, or as interveners.

Upon the hearing, the pleadings and evidence taken before the Interstate Commerce Commission were by stipulation received in evidence, so that the record presented for our consideration is the same that was presented to the Interstate Commerce Commission, excepting that a transcript of the oral argument was objected to by the defendants; a ruling on that objection was reserved until consideration of the entire case. This objection will now be overruled.

While the evidence is voluminous and in some respects conflicting, in the main aspects of the case there is no controversy between the parties, and the issues presented to this court are not only narrowed by the restrictions upon the court in dealing with the findings and conclusions of the Interstate Commerce Commission to which Congress has granted the power and authority to determine the facts involved in rate making, which findings are conclusive upon the courts if based upon substantial evidence, but also by the further fact that the petitioners rely in the main upon the findings of the Interstate Commerce Commission to support the legal conclusions which they press upon the court. These considerations will make unnecessary an elaborate statement of facts or a comprehensive review of the evidence in this opinion. For an elaborate and comprehensive statement thereof we refer to the published opinion of the Interstate Commerce Commission in this case, 151 I. C. C. 244.

It appears without contradiction that in establishing their freight rates throughout

the country upon perishable products requiring refrigeration, the railroads have adopted three different types of refrigerating service for which compensation is charged to the shipper. The first type of refrigeration is what is called the "stated charge" for standard refrigeration, published in section 2 of the Perishable Protective Tariff. Broadly speaking, this involves filling the ice bunkers, or refrigerating cars, at each icing station established by the carrier at suitable intervals along the railway. The second type of service rendered, published in section 4 of said tariff, is that wherein, after the initial icing, the cars are re-iced only at such points and in such quantities as may be designated by the shipper at a designated cost of ice per ton. The third type of refrigeration is where, after the initial icing, the perishable product is shipped to its destination without any re-icing, the initial ice to be furnished by the shipper, or by the carrier, on the cost per ton basis; a supercharge under rule 240 is added on long hauls.

The second type of refrigeration charge, designated throughout the record as the "cost of ice" basis, is applied by all the petitioning railroads to certain perishable products in their respective tariffs. It is also applied by all of them to poultry and dairy products originating in all the forty-two states east of the six above-mentioned western states. This method of charging for refrigeration is established by all the petitioners, including those having their termini in the six westernmost states, for all poultry and dairy products which do not originate in those six states on their own lines, as will be hereinafter more particularly pointed out. The purpose of the Pacific States Butter, Egg, Cheese & Poultry Association, as disclosed by its petition to the Interstate Commerce Commission, was to compel the railroads accepting poultry and dairy products for shipment in the six westernmost states to apply to such shipments the same method of charging for refrigeration as is applied by them and by all other railroads in all the other states of the United States; that is to say, railroads having determined in their schedules the cost of ice at their respective icing stations, it is desired that the shipper be permitted to designate the points at which, and the extent to which, such icing should occur, ice to be paid for at the per ton rates thus already fixed by the railroads in their published tariffs as aforesaid. This petition was granted by the Interstate Commerce Commission in the order now under attack.

It would seem at first blush that an order establishing for the six westernmost states the same system of charging for refrigeration applied by the petitioners herein in the rest of the United States would be just and reasonable, but the attack upon this order herein is based upon the admitted fact that the railroads, in establishing the cost of the ice per ton basis, have not included in that cost all the elements making up the cost of refrigeration. In fixing that cost, there has been included in the cost of ice per ton the cost of the manufacture of the ice, of its transportation to the icing station, and the cost of switching the refrigerating cars to the icing station, and the cost of labor of placing the ice in the bunkers of the refrigerating car. See Perishable Fruit Investigation, 56 I. C. C. 449, 470. It is claimed, and the Interstate Commerce Commission finds it to be a fact in this case (151 I. C. C. 264, 265), that the cost of ice basis of charging for refrigeration does not include every element which might, could, or should be included in a proper charge for refrigeration in this, that in the cost of ice basis no addition is made to the cost of the ice per ton by reason of the expenditures involved in transporting the ice together with the refrigerated product in the refrigerating car after icing as distinguished from the cost of hauling the refrigerated product; that no charge is included in the cost of ice basis for the repair of the ice bunkers of the refrigerating car as distinguished from the cost of the repair of the other portion of the car which might, could, or should be included in the proper segregation of the costs of refrigeration as a cost of refrigeration, and that no charge is included in the cost of ice for the expenses of supervision that might be rightly apportioned to the cost of refrigeration. The petitioners rely upon the opinion of the Interstate Commerce Commission in Re Refrigeration Charges from the South, 151 I. C. C. 649, 653.

The contention of the petitioners upon that subject may be briefly and concisely stated as follows: The Hepburn Act, § 2, amending Interstate Commerce Act § 6, par. 1 (49 USCA § 6, par. 1), requires the carrier to separately state certain charges, including, among others, "all * * * icing charges." It is claimed, and is well settled by the decisions of the Supreme Court, that, where a railroad rate is under attack before the Interstate Commerce Commission or before the court, that rate must stand or fall in the test as to its reasonableness, upon the proposition that the rate under attack must itself furnish

a reasonable and adequate return for the service rendered, and that a reasonable and adequate return must pay the cost of that service, as distinguished from all other service, plus a reasonable profit thereon. Southern Ry. Co. v. St. Louis Hay & Grain Co., 214 U. S. 297, 29 S. Ct. 678, 53 L. Ed. 1004; Cotting v. Godard, 183 U. S. 79, 22 S. Ct. 30, 46 L. Ed. 92; Interstate Commerce Commission v. Union Pac. R. Co., 222 U. S. 541, 32 S. Ct. 108, 56 L. Ed. 308; Interstate Commerce Commission v. Stickney, 215 U. S. 98, 30 S. Ct. 66, 54 L. Ed. 112; Northern Pac. R. Co. v. North Dakota, 236 U. S. 605, 35 S. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; Northern Pac. R. Co. v. Dept. Pub. Works, 268 U. S. 39, 45 S. Ct. 412, 69 L. Ed. 836; Chicago, M. & St. P. Ry. Co. v. Public Utilities Commission, 274 U. S. 344, 47 S. Ct. 604, 71 L. Ed. 1085.

It is claimed that the Interstate Commerce Commission expressly found that the cost of icing directed by them to be applied to the products in question does not so reasonably and adequately compensate the railroad company, and that the order is therefore void. The Commission did find as a fact that the stated charge did include, and that the cost of ice basis did not include, compensation to the carrier for the cost of hauling the ice after it was placed in the bunkers, the cost of bunker repair, and the cost of supervision. The Commission did conclude, however, that the line-haul freight rate was sufficiently high to include compensation for these items. We quote from its opinion herein (151 I. C. C. pages 266, 267) in that regard as follows:

"This leads to the question whether the line-haul rates upon the traffic in question are sufficiently high to provide compensation for the elements of refrigeration cost not covered by the cost-of-ice basis, so that it can be substituted without injustice to defendants. Reduced to compensation per 100 pounds of freight carried, the amount involved is not great. The cost elements in question are for supervision, bunker damage, and ice haulage. Taking defendants' estimates at face value, these elements do not on the average aggregate more than $51 per car per trip, and these estimates were based upon full standard refrigeration and a cost per ton-mile for haulage which is open to serious question. The $51 per car, however, is no more than 21 cents per 100 pounds. If the $3 transcontinental rate on dairy products were reduced by that amount it would still exceed by $1.19 the transcontinental rate which we recently prescribed upon deciduous fruits from California points. It is true that dairy products have a higher value than fruits and vegetables and therefore may well be charged somewhat higher freight rates, but in the rates exhibited of record there is ample margin to care for both this higher value and the elements of refrigeration cost above mentioned.

"The question, as we see it, is not whether the carriers have taken these elements of refrigeration cost into consideration in arriving at the freight rates, but whether those rates are in fact sufficiently high to provide compensation for such costs. If they are sufficiently high, the reasons which impelled the carriers to bring them to that level are of little importance. In our opinion, after considering the many comparisons of record with rates on dairy products subject to the cost-of-ice basis which we have ourselves prescribed in other parts of the country and with rates on such perishable commodities as fruits and vegetables, fresh meat and packing-house products, we are convinced that in general they are sufficiently high so that the cost-of-ice basis can be established on the traffic in question without injustice to defendants. It is true that our decision in Westbound Transcontinental Refrigeration Charges [34 I. C. C. 140], supra, went only so far as to decide that the westbound transcontinental rates on dairy products included compensation for the supervision, bunker damage, and ice haulage incident to the initial icing; but it should be borne in mind that so far as the replenishing charges approved in that case were concerned, we stated that the record was insufficient upon which to base a finding on 'other than the reasonableness of the charges involved,' and refused to determine the merits of the cost-of-ice basis in connection with the traffic in question. Here no such insufficiency of record exists."

The foundation of this contention is the claim that the cost incident to the refrigeration of freight must be treated as separate and distinct from the charge for the transportation of the freight which is refrigerated as distinguished from all other charges for all other service performed by the railroad company. In the case at bar, the Interstate Commerce Commission, while recognizing and expressly finding that the icing charge set up by the railroads which they directed be applied to the products in question did not pay the above-mentioned elements properly applicable to refrigeration, nevertheless held that the freight rate upon the product itself established by the tariff was amply sufficient, not only to pay reasonable cost of transpor-

tation, but also to absorb the elements of cost in the transportation which under the rule above stated might more properly be charged to the expense of icing, that is to say, the cost of hauling the ice after its placement in the refrigerating cars, the cost of repairs of ice bunkers, and its supervision.

It is not claimed that the total charge of the railroad company for transporting freight and for the refrigeration thereof under the rule established by the order of the Interstate Commerce Commission is unreasonable or void, but it is claimed that the Interstate Commerce Commission was precluded from consideration of the amount of the freight rate applied to such products in determining the reasonable value of icing under the rule above stated, and that, if it was desired to secure a total rate for freight and refrigeration which would reasonably compensate the carrier for the service of transportation and refrigeration of the freight, the attack in question should have been centered upon the freight rate as too high rather than upon the cost of icing, which is admittedly not high enough to cover the total cost of refrigeration. This question was disposed of by the Commission in its opinion herein (151 I. C. C. pages 263, 264), as follows:

"In arriving at ultimate conclusions it is necessary to consider at the outset a legal question raised by defendants. They point out that section 6 of the interstate commerce act provides that the schedules of rates, fares, and charges which carriers are required to publish 'shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the Commission may require, etc.' The stated charges for refrigeration service, they say, have been published in accordance with this requirement, and they contend that if these charges are reasonable in themselves for the service rendered they can not lawfully be reduced upon a theory that the concurrently effective freight rates are sufficiently high to include the various factors of refrigeration cost other than the actual cost of preservative used. In support of this contention they rely upon Interstate Commerce Commission v. Stickney, 215 U. S. 98 [30 S. Ct. 66, 54 L. Ed. 112], and also cite National Live Stock Exchange v. A., T. & S. F. Ry. Co., 107 I. C. C. 512, where we approved the separate publication of a charge for bedding livestock, found it not unreasonable in itself, and refused to condemn it upon the ground that in connection with the line-haul rates, which were not at-

tacked, it might result in unreasonable aggregate charges.

"A contention quite similar to this was advanced in Perishable Freight Investigation, supra, and considered at length in [56 I. C. C.] pages 461–465 of our report. After considering the history of section 6 and the former practice of providing refrigeration service, in many cases, through private car-line companies whose charges were not published or filed with us, we said, at page 463 [of 56 I. C. C.]:

" 'Manifestly, the intent was merely to require, where a separate charge was in fact levied, that it be published and filed, so that it might be uniformly available and uniformly applied without discrimination. In other words, while all charges must be separately stated, the statute does not make it unlawful to secure compensation for the protective service by regarding it as an integral part of the service of transportation.'

"We went on to show that this conclusion is not discordant with the decisions of the Supreme Court, including that cited above by defendants, and also a later case, Atchison Ry. Co. v. United States, 232 U. S. 199 [34 S. Ct. 291, 58 L. Ed. 568], which bears more directly upon the issue. Our final comment, at pages 464, 465 [of 56 I. C. C.], was as follows:

" 'In many respects protective service against heat or cold is closely intermeshed with the freight-haulage service. So close is the association that there has been no separate accounting of expense items, and the carriers in the present proceeding have been forced to depend to a substantial extent upon mere, and often rough, estimates in attempting to determine the separate cost of the protective service. It is neither strange nor unreasonable that this service should frequently have been regarded as an element of transportation, to be covered by a single rate. We do not feel that the statutory provisions in question can be given the construction which has been urged by the representatives of the Director General. Our conclusion is that it is not unlawful to secure compensation for all or any part of the protective service through the line-haul rate on perishable freight, and that no presumption exists that compensation is not secured in this way.' "

The contention now made by the petitioners is not new. Similar argument was offered in Perishable Freight Investigation, 56 I. C. C. 449. We quote at length from the

Commission's report in that case (pages 463–465 [of 56 I. C. C.]):

"Both from this history and from the subsequent practice, we think it evident that it was not the intent, when these provisions of law were enacted, to prohibit a carrier, if it wished to do so, from regarding the haulage of the freight and any incidental protection against heat or cold as one combined transportation service for which a single charge might lawfully be made, or from treating certain elements of the protection in this way and making a separate charge for others which could more readily be segregated from the haulage service. Manifestly, the intent was merely to require, where a separate charge was in fact levied, that it be published and filed, so that it might be uniformly available and uniformly applied without discrimination. In other words, while all charges must be separately stated, the statute does not make it unlawful to secure compensation for the protective service by regarding it as an integral part of the service of transportation.

"And in our opinion this conclusion is not discordant with such decisions of the United States Supreme Court as bear upon the subject. It is true that there are expressions in Interstate Commerce Commission v. Stickney, 215 U. S. 98 [30 S. Ct. 66, 54 L. Ed. 112], which seem, when considered apart from their setting, to furnish foundation for the claim now advanced by the representatives of the Director General. We refer especially to the statement on page 105 [of 215 U. S., 30 S. Ct. 66]:

" 'If the terminal charge be in and of itself just and reasonable it cannot be condemned or the carrier required to change it on the ground that it, taken with prior charges of transportation over the lines of the carrier or of connecting carriers, makes the total charge to the shipper unreasonable. That which must be corrected and condemned is not the just and reasonable terminal charge, but those prior charges which must of themselves be unreasonable in order to make the aggregate of the charge from the point of shipment to that of delivery unreasonable and unjust. In order to avail itself of the benefit of this rule the carrier must separately state its terminal or other special charge complained of, for if many matters are lumped in a single charge it is impossible for either shipper or commission to determine how much of the lump charge is for the terminal or special services. * * *'

"But this statement must be viewed in the light of the circumstances which were then before the court. As we said of this case in Associated Jobbers of Los Angeles v. A., T. & S. F. Ry. Co., 18 I. C. C. 310, the opinion 'holds that a carrier is justified in charging a reasonable rate for a delivery which it can not make upon its own line, and that this rate, when separately stated, must be judged as to its reasonableness by itself.' Quoting again from the opinion on page 109 [of 215 U. S., 30 S. Ct. 66]:

" 'If any shipper is wronged by the aggregate charge from the place of shipment to the Union Stock Yards it would seem necessarily to follow that the wrong was done in the prior charges for transportation, and, as we have already stated, should be corrected by proper proceedings against the companies guilty of that wrong, otherwise injustice will be done. If this charge, reasonable in itself, be reduced the Union Stock Yards Company will suffer loss while the real wrongdoers will escape.'

"The essential governing principle is that one carrier may not be made to suffer for the shortcomings of another.

"In the present instance, the railroads are solely and directly responsible for the protective service, even when performed through the agency of a car-line company, and the question of justice or injustice to a separate entity does not enter in. Moreover, the present issue has been more specifically considered in a later case, Atchison Railway Co. v. United States, 232 U. S. 199 [34 S. Ct. 291, 58 L. Ed. 568]. There a charge which we had prescribed for refrigeration service upon precooled shipments of citrus fruit from California was before the court, a charge which did not cover the cost of hauling the necessary ice, since we held that compensation therefor was included in the line-haul revenue. Upon the authority of Interstate Commerce Commission v. Stickney, supra, the carriers contended that the receipt of a fair return for carrying 33,000 pounds of fruit afforded no reason for compelling them to haul 5,000 pounds of ice 2,000 miles for nothing. Stating that 'it is evident that the Commission did not intend to require the carriers to haul 5,000 pounds of ice without reasonable compensation, but considered that the haul of the ice was so much a part of the haul of the precooled freight, that the expense could properly be treated as included or absorbed in the rate on the fruit itself,' the court went on to say (pages 220, 221 [of 232 U. S., 34 S. Ct. 291]):

" 'What is a proper rate on fruit in pre-cooling shipments, or a fair charge for hauling necessary ice or rendering other transportation services are all rate-making matters committed to the Commission. It may determine what shall be the difference in rate between carload and less than carload lots. It may decide whether the difference in revenue, due to a difference in method of loading, warrants a difference in the rate on carload shipments of the same article. It may prescribe the form in which schedules shall be prepared and arranged (sec. 6) and may approve tariffs stating that the single rate includes both the line haul and accessorial services absorbed in the rate. Conversely, it may prescribe a tariff fixing a through rate which includes not only the haul of the fruit, but the haul of the ice necessary to keep the fruit in condition. All these are matters committed to the decision of the administrative body, which, in each instance, is required to fix reasonable rates and establish reasonable practices.'

"In many respects protective service against heat or cold is closely intermeshed with the freight-haulage service. So close is the association that there has been no separate accounting of expense items, and the carriers in the present proceeding have been forced to depend to a substantial extent upon mere, and often rough, estimates in attempting to determine the separate cost of the protective service. It is neither strange nor unreasonable that this service should frequently have been regarded as an element of transportation, to be covered by a single rate. We do not feel that the statutory provisions in question can be given the construction which has been urged by the representatives of the Director General. Our conclusion is that it is not unlawful to secure compensation for all or any part of the protective service through the line-haul rate on perishable freight, and that no presumption exists that compensation is not secured in this way."

Inasmuch as the contention of the petitioners is based upon their interpretation of the Hepburn Act with reference to the setting up of "charges" for "icing," the correctness of this interpretation will first be considered. Assuming for the moment that Congress intended that a separate charge for icing should be set up by the railroads, we are to determine what is meant by the word "icing" in connection with transportation. The word is not a technical expression having a technical meaning, but is one of general use. In the Century Dictionary in current use at the time of the adoption of the Hep-

burn Act in 1906, it is defined as "to apply ice; refrigerate; preserve in ice, as meat." In the Standard Dictionary of 1913 it is defined "to freeze or chill with or as with ice; cover with ice; enclose or preserve in ice; refrigerate."

Certainly, in the ordinary acceptation of the term as applied to the application of ice to products transported in refrigerating cars, the charge for placing the ice in the bunkers of the refrigerating car is a charge for icing. It would not occur to the layman, we think, that in fixing a charge for icing it was necessary or even proper to include in that charge the transportation of the ice with the product after the icing was completed. Certainly it requires a stretch of the ordinary meaning of language to say that the cost of hauling ice after it is placed in the refrigerating car to chill the contents of the car is a cost of icing. Throughout the case the petitioners have referred to the cost of icing, or the charge for icing, as the equivalent of a charge for refrigeration. The two words are not synonymous. Apparently the word "icing," properly construed, may or may not include refrigeration. The petitioners themselves have recognized this fact in the charges that they have established in connection with the refrigeration of perishable products. In the charge for standard refrigeration or "stated charge" icing, they have uniformly included the cost of hauling the ice after the cars have been iced, while in the charge for icing on the "cost of ice" basis they have not included the cost of hauling the ice in the car after it has been placed therein for purposes of refrigeration. In considering the effect of this conduct on the part of the railroads, it has to be borne in mind that the primary duty is placed upon them of fixing freight charges and of establishing and promulgating "icing charges." In asking the court to hold that a proper icing charge necessarily includes the cost of hauling the ice after it is placed in the car for purposes of refrigeration, the petitioners are asking the court to hold that they have consistently violated the act of Congress for more than a quarter of a century by ignoring the duty which they now claim is upon them and upon the Interstate Commerce Commission and upon the court to establish icing charges which would include every element of the cost of refrigeration. It might be seriously questioned whether petitioners are in position to invoke the jurisdiction of a court of equity under the circumstances. The question is, Do they come into a court of equity with clean hands when

they claim that the Interstate Commerce Commission is violating the law by doing the very thing that the petitioners have done for twenty-five years, and which they are still·doing in violation of law? In this connection it may be observed that the Interstate Commerce Commission did not set up a new scheme for determining "icing charges," but merely permitted the shippers to take advantage of rates already established by the railroads for comparable, or for the same, products.

We will not, however, base our determination in that regard upon the principle of equity we have suggested, but consider the conduct of the railroads contemporaneous with, and immediately subsequent to, the passage of the act, as interpretative of its meaning. In this interpretation the Interstate Commerce Commission has consistently acquiesced, if not directly participated, so that we have the parties to this litigation concurring over a long period of years in the interpretation of the statute which both now ask us to interpret, the respondent in accordance with the constant practice and the petitioners in conflict with that practice. Aside from all other considerations than the proper interpretation of the word "icing" in the law, we would be inclined to hold that the standard or "stated charge" for refrigeration, which it is admitted includes the cost of ice haulage after icing, and the charge for icing on "cost of ice basis," are both permissible so far as the act of Congress requiring a separation of all icing charges is concerned, but there are other and even more persuasive reasons for this conclusion. The purpose of Congress in the enactment of section 6 of the Interstate Commerce Act, as amended by Hepburn Act, § 2, is obviously to provide for a system of tariff schedules, rates, fares, and charges which would be uniform and consistent and apply without discrimination or favoritism to all shippers similarly situated. It is obviously intended thereby that the total charge to be paid by the shipper should be clearly ascertainable from the tariff schedules, so that one shipper should not have imposed on him auxiliary charges which might not be imposed upon others. United States v. Chicago & A. Ry. Co. (D. C.) 148 F. 646; Chicago & A. Ry. Co. v. United States, 212 U. S. 563, 29 S. Ct. 689, 53 L. Ed. 653; United States v. Hanley (D. C.) 71 F. 672; United States v. Ill. Term. R. Co. (D. C.) 168 F. 546; Standard Oil Co. of N. Y. v. United States (C. C. A.) 179 F. 614; Louisville & N. R. Co. v. Dickerson (C. C. A.) 191 F. 705;

Cleveland, C. C. & St. L. R. Co. v. Hirsch (C. C. A.) 204 F. 849. This is in accord with the uniform holding of the Interstate Commerce Commission. Rice v. L. & N. R. Co., 1 I. C. C. 503; In re Tariffs of Transcontinental Lines, 2 I. C. C. 324; American Warehousemen's Ass'n v. Illinois Cent. R. Co., 7 I. C. C. 556; H. B. Pitts & Son v. St. L. & S. F. R. Co., 10 I. C. C. 684; Cosmopolitan Shipping Co. v. Hamburg-American Packet Co., 13 I. C. C. 266; Voorhees v. Atlantic Coast Line R. Co., 16 I. C. C. 42; Schultz-Hansen Co. v. So. Pac. Co., 18 I. C. C. 234.

It is certainly clear from the statute that there is no intention of setting up a system of bookkeeping for common carriers, for this function was, by the same act, delegated, so far as was necessary for the purpose of supervising interstate commerce carriers, to the Interstate Commerce Commission (49 USCA § 20, particularly subdivision 5). It is obvious that the immediate concern of the shipper is with the total charge to him for transporting his freight safely and in good condition from the shipping point to the point of delivery. It is entirely immaterial to the shipper whether the extra cost due to the increased weight of ice carried for refrigeration is carried by the railroad company as a part of the rate of the line freight haul or as a part of the cost of refrigeration, and the same is true of all other itemization in connection with the making of the rate or the system of accounting required of or permitted by the Interstate Commerce Commission. These details of rate making and rate fixing were undoubtedly intended by Congress to be delegated to, and determined by, the Interstate Commerce Commission where its powers were invoked, and the courts have not only consistently recognized their inability to properly fix rates, but also have exercised supervision thereover only as required to protect the fundamental rights of the carrier, and of the public. These views in reference to the purpose of section 6 of the Interstate Commerce Act, as amended by Hepburn Act, § 2, have been consistently adhered to by the Interstate Commerce Commission, and we think rightly so. (See above quotation from its opinion in this case.) The petitioners have not attempted to justify their interpretation of section 6 with reference to what Congress intended by the words "all * * * icing charges," but, as we have said, have assumed that icing charges are synonymous with refrigerating charges, and have assumed that the only proper way that such charges can be separately stated is by

including therein all the costs of refrigeration, whereas it seems apparent that Congress merely intended to require that such charges as the railroad company set up as icing charges should be stated separately and published as such. These considerations thus far advanced lead us to the conclusion that Congress did not require, and did not intend to require, that the icing charge made by the railroad company should of necessity include every element in the cost of refrigeration which could be properly assigned by competent experts and accountants to the cost of refrigeration, but only to require that, when a charge was made therefor in addition to the line-haul freight rate, such charge should be published in the tariff schedules of the carrier. If this conclusion is correct, the action of the Interstate Commerce Commission in requiring the carrier to conform to its own icing charges as applied to other perishable commodities is not incorrect, because the icing charge per se does not include elements of cost which expert bookkeepers might determine and have determined to be a part of the refrigerating cost.

As has been stated, the petitioners do not alone devote themselves to a question of the proper interpretation of section 6 of the Interstate Commerce Act, as amended by section 2 of the Hepburn Act, supra, as a basis for their claims, but rely upon certain decisions of the Supreme Court which they hold are applicable to the situation herein. In the first place, reliance is placed upon the admitted rule of constitutional law developed by the Supreme Court to the effect that, in proceedings before the Interstate Commerce Commission, or other regulatory bodies throughout the United States involving rates charged for service, in determining a reasonable amount thereof such regulatory bodies must fix a charge commensurate with the service rendered. Second, it is claimed that the Supreme Court of the United States in the Stickney Case, 215 U. S. 98, 30 S. Ct. 66, 69, 54 L. Ed. 112, has expressly held in the case of "terminal charges," which are also required by the same section of the Hepburn Act (section 6, par. 1, 49 USCA, supra) to be separately stated, that the Interstate Commerce Commission could not require the diminution or abandonment of that rate where it expressly found that the rate in and of itself was reasonable, notwithstanding the fact that the Commission found as a fact that the line-haul freight rate was sufficient to include such terminal charge. In view of the fact that the petitioners mainly base their case on this decision of the Supreme Court, we will consider it more in detail.

The question there involved had been a matter of contention over a period of many years. The Interstate Commerce Commission found that the railroads entering Chicago had established a separate railroad corporation for the transportation of live stock from the railroads in question to the Chicago stockyards. The stock of this Belt Line Railroad was owned by the various railroads transporting live stock to Chicago. It is found as a fact by the Interstate Commerce Commission that the cost of delivery of freight in Chicago by the common carriers was $5.40 per car. It was therefore concluded by the Commission that, inasmuch as the line-haul freight rate necessarily included these terminal expenses amounting to $5.40, where the railroad company was spared that expense by reason of delivering its cars loaded with live stock to the terminal road, it could not properly charge an additional $2 terminal charge where it had already charged a line-haul freight rate more than double that amount for the same service. In passing upon this contention, the Supreme Court declared immaterial the fact that the Belt Line Railway was owned by the common carriers whose roads were in question. It therefore held that to eliminate or reduce terminal charge for the use of the Belt Line Railway would be to reduce a charge found to be reasonable for such service while at the same time allowing them to charge a line-haul freight rate which under the circumstances the Interstate Commerce Commission had virtually held to be unreasonable; that is, the Commission fixed a charge unreasonably low to compensate for one it found to be unreasonably high. The court, therefore, held that, notwithstanding it might be true, as found by the Interstate Commerce Commission, that it cost the railroad company twice as much to deliver the stock at its own terminal for terminal charges as it did to deliver the stock over the Belt Line Railway, the action of the Interstate Commerce Commission was erroneous and void. It is clear, however, that in reaching this conclusion the court was largely influenced by the consideration that the terminal charge collected by the carrier was for service rendered by an independent carrier, and that for such service so rendered by such independent carrier the charge actually made was reasonable. In order to make this more clear, we quote from the decision as follows: "Under those circumstances it seems impossible to avoid the conclusion that, considered

of and by itself, the terminal charge of $2 a car was reasonable. If any shipper is wronged by the aggregate charge from the place of shipment to the Union Stock Yards, it would seem necessarily to follow that the wrong was done in the prior charges for transportation, and, as we have already stated, should be corrected by proper proceedings against the companies guilty of that wrong, otherwise injustice will be done. If this charge, reasonable in itself, be reduced, the Union Stock Yards Company will suffer loss while the real wrongdoers will escape. It may be that it is more convenient for the Commission to strike at the terminal charge, but the convenience of Commission or court is not the measure of justice."

The more general language of the opinion relied upon by the petitioners and quoted from page 105 of 215 U. S., 30 S. Ct. 66, 67, must be construed in the light of the conclusion above stated. This excerpt is as follows: "By section 15, the Commission is authorized and required, upon a complaint, to inquire and determine what would be a just and reasonable rate or rates, charge or charges. This, of course, includes all charges, and the carrier is entitled to have a finding that any particular charge is unreasonable and unjust before it is required to change such charge. For services that it may render or procure to be rendered off its own line, or outside the mere matter of transportation over its line, it may charge and receive compensation. Southern Railway Co. v. St. Louis Hay Co., 214 U. S. 297, 29 S. Ct. 678, 53 L. Ed. 1004. If the terminal charge be, in and of itself, just and reasonable, it cannot be condemned or the carrier required to change it on the ground that it, taken with prior charges of transportation over the lines of the carrier or of connecting carriers, makes the total charge to the shipper unreasonable. That which must be corrected and condemned is not the just and reasonable terminal charge, but those prior charges which must of themselves be unreasonable in order to make the aggregate of the charge from the point of shipment to that of delivery unreasonable and unjust. In order to avail itself of the benefit of this rule, the carrier must separately state its terminal or other special charge complained of; for, if many matters are lumped in a single charge, it is impossible for either shipper or Commission to determine how much of the lump charge is for the terminal or special services. The carrier is under no obligations to charge for terminal services. Business interests may justify it in waiving any such

charge, and it will be considered to have waived it unless it makes plain to both shipper and Commission that it is insisting upon it."

It must be conceded that this portion of the opinion, taken alone, and without recognizing that the court was there dealing with a charge made for services performed by another carrier, strongly supports the contention advanced by petitioners in this case. But the petitioners are seeking to apply the reasoning in that case to a situation entirely different and distinct therefrom, as may be indicated by a situation more nearly analogous to the case at bar. Suppose that the receivers of the Great Western Railroad in that case had been delivering live stock to the Union Stock Yards in Chicago over its own lines for the established line haul freight rate; that thereafter, in pursuance of the Hepburn Act, it had set up a separate terminal charge of $5.40 for the delivery of freight at the stock yards; that this new and additional rate was attacked by the shippers on the ground that it was unreasonable, not because it was an excessive amount for a terminal charge, but because the line-haul freight rate theretofore established had absorbed that charge, and that the shipper paid therefor when it paid the line-haul freight rate, would the Supreme Court under these circumstances say to the shipper, "You have made your attack upon a reasonable terminal rate and you should have made it upon the line haul freight rate?" We think not. The consideration which moved the court to treat the terminal charge in the Stickney Case as one which could not be reduced where reasonable could not be applicable to this new charge by the same carrier for the same service which he had theretofore rendered for the compensation theretofore paid in the long-haul freight rate. The above-quoted language carries with it a clue to the proper decision of this question. It is apparent that the decision is not based upon the mandatory requirement that terminal charges be separately stated, for it is said: "In order to avail itself of the benefit of this rule, the carrier must separately state its terminal or other special charge complained of; for, if many matters are lumped in a single charge, it is impossible for either shipper or commission to determine how much of the lump charge is for the terminal or special services. The carrier is under no obligations to charge for terminal services. Business interests may justify it in waiving any such charge, and it will be considered to have waived it unless it

makes plain to both shipper and Commission that it is insisting upon it."

In view of this language, it is fairly apparent that the answer to the carrier under such circumstances would be this: "You have, by including in your line haul freight rate, the expenses of terminal delivery, waived a separate charge therefor, and you cannot now set up a separate and additional charge therefor, because to do so would be unreasonable in view of the fact that you have already been compensated for that service in the line haul freight rate." See Los Angeles Switching Case, 234 U. S. 294, 34 S. Ct. 814, 58 L. Ed. 1319. We are not, however, left to mere inference from the general language of the opinion in the Stickney Case, but subsequent decisions clarify the situation. In the case of the Atchison, T. & S. F. R. Co. v. U. S., 232 U. S. 199, 34 S. Ct. 291, 296, 58 L. Ed. 568, the Supreme Court had under consideration a ruling of the Interstate Commerce Commission with reference to the charges for transportation of oranges in carload lots, and was dealing primarily with the difficulties arising from a new system of refrigeration involving a pre-cooling of the fruit. Two systems of pre-cooling were used, that inaugurated by the common carrier of placing the entire car with its contents in a refrigerating plant and cooling the fruit while in the car by blowing chilled air through the ventilators of the car into the space containing the packed fruit. This system required ample space between the packed boxes for the circulation of cool air. The packers had inaugurated a system of pre-cooling by which the packed boxes of oranges were cooled to a temperature of 33° Fahrenheit in the refrigerating plant of the packing house. These boxes were then packed solidly in the car without any space for ventilation between the boxes. In view of the temperature of the oranges, the circulation of air would tend to raise rather than decrease the initial temperature of the fruit, the car itself was cooled by the air of the refrigerating plant of the packing house circulating during the process of loading the car, and also by the oranges themselves. In addition, the car was iced at the packing plant in order that the temperature might not be increased during the process of transporting the car from the packing house to the main line of the railway or to the icing or cooling plant of the railroad company.

The significant thing, from the standpoint of rate making about the cooling system inaugurated by the packers as distinguished from that inaugurated by the carriers, was that a greater weight of oranges could be packed in the same refrigerating car where ventilating spaces were not left, and consequently the pay load of the car was increased. Thus the revenue provided by the railroad company from the line-haul freight rate was increased from 27,200 pounds to 33,000 pounds. This freight rate, $1.15 per 100 pounds, had been fixed by the Interstate Commerce Commission preliminarily in a hearing involving both the line-haul freight rate charge and the refrigerating charge. The refrigerating charge, however, was postponed, and, upon the final determination of that matter, was reduced on pre-cooled oranges from $30 to $7.50 per car. The carriers contended that this $7.50 did not pay the actual cost of transporting the ice placed in the bunkers of the refrigerating car. It was conceded that the reasonable cost of transporting that ice was $5 more than the total amount allowed by the Interstate Commerce Commission as an icing charge for hauling pre-cooled fruit. The situation may best be stated in the language of the Supreme Court:

"6. The appellants insist, however, that even if the shippers are entitled to furnish the ice, the carriers are entitled to pay for hauling it. They claim that the charge of $7.50 is confiscatory because it does not cover what the Commission found to be the actual cost of the carriers' pre-cooling service. They point to the fact that the rate of $1.15 per cwt. on oranges was found to be reasonable, without regard to the character of the shipment, and whether the fruit moved under ventilation, standard refrigeration, or pre-cooling shipment,—additional sums being allowed for furnishing or hauling ice needed in transportation of the fruit. They admit that more revenue is derived from a carload of pre-cooled fruit, weighing 33,000 lbs., than from a car where the load weighs 27,200, but insist that the greater revenue is because of a greater service rendered and a greater weight hauled. On the authority of Interstate Commerce Commission v. Stickney, 215 U. S. 98, 105, 30 S. Ct. 66, 54 L. Ed. 112, 113, they contend that the receipt of a fair return for carrying 33,000 lbs. of fruit affords no reason for compelling them to haul 5,000 lbs. of ice 2,000 miles for nothing, when, as found by the Commission, the actual cost of the haul is $12.50.

"The order does not show the items going to make up the $7.50 charge. In the brief for the Commission it was said to include $5 for damage to the bunkers and $2.50 for

profit. And since the report shows that the carriers were also entitled to $12.50 for hauling the ice, a charge of only $7.50 for a $20 service would at first blush appear to be not only unreasonable, but confiscatory. But the order is to be read in connection with the report of which it forms a part. When so read, it is evident that the Commission did not intend to require the carriers to haul 5,000 lbs. of ice without reasonable compensation, but considered that the haul of the ice was so much a part of the haul of the pre-cooled freight, that the expense could properly be treated as included or absorbed in the rate on the fruit itself. Cf. Farrar Lumber Co. v. N., C. & St. L. R. Co., 25 I. C. C. 25; Swift v. M. P. Ry. Co., 22 I. C. C. 385.

"The cost of such haul was $12.50,—equivalent to 3.8 on the 33,000 lbs. of oranges in a pre-cooled shipment, and as a mere matter of figures, it was immaterial to the carriers whether they were permitted to charge $1.11.2 on the fruit and $12.50 for the ice, or $1.15 on the fruit alone without any distinct charge for transporting the ice. In either event, the revenue received was more than that derived from a car of standard refrigeration, without corresponding increase of cost.

"7. The claim that the order modifies the established rate of $1.15, and reduces it to $1.11.2 in pre-cooled shipments, thereby discriminating against the small fruit grower and those who forward under ventilation, or under the carriers' method of refrigeration, is not an issue presented by any assignment of error in this record, even if the carriers were in position to make such a contention. Int. Com. Comm. v. Chicago, R. I. & P. Ry., 218 U. S. 88, 109, 30 S. Ct. 651, 54 L. Ed. 946, 957. There is no claim in this case that such rate, thus distributed, is unreasonable.

"8. What is a proper rate on fruit in pre-cooling shipments, or a fair charge for hauling necessary ice or rendering other transportation services, are all rate-making matters committed to the Commission. It may determine what shall be the difference in rate between carload and less than carload lots; it may decide whether the difference in revenue, due to a difference in method of loading, warrants a difference in the rate on carload shipments of the same article. It may prescribe the form in which schedules shall be prepared and arranged (§ 6), and may approve tariffs stating that the single rate includes both the line haul and accessorial services absorbed in the rate. Conversely, it may prescribe a tariff fixing a through rate which includes not only the haul of the fruit, but the haul of the ice necessary to keep the fruit in condition. All these are matters committed to the decision of the administrative body, which, in each instance, is required to fix reasonable rates and establish reasonable practices. The courts have not been vested with any such power. They cannot make rates. They cannot interfere with rates fixed or practices established by the Commission unless it is made plainly to appear that those ordered are void. Int. Com. Comm. v. Union Pac. R. R., 222 U. S. 541, 547, 32 S. Ct. 108, 56 L. Ed. 308, 311. No such showing is made in this case. The decree must therefore be affirmed."

This case holds it proper under the circumstances stated therein to consider the line-haul freight rate in determining the reasonableness of the icing charge or refrigerating charge incidental to the transportation of the perishable freight, and that an icing charge which ignored admitted elements of the refrigerating charge might be established by the Commission as a reasonable charge for icing or refrigeration, notwithstanding the fact that in doing so the line-haul freight rate must be looked to to augment the icing charge in order to compensate the carrier for the cost of refrigeration. The situation in that case was unique, in that the very system of pre-cooling under consideration increased the carrying capacity of the individual car involved, and added to the car revenue of that particular car without commensurate increase of cost. The case is direct authority for the proposition already advanced in this opinion that all the refrigeration charges need not be stated separately from the line-haul freight rate, but it is far from a holding that in all cases a line-haul freight rate that applies to the product, whether refrigerated or not, can be looked to in eking out a refrigeration charge which in and of itself is not compensatory. At the very least, then, the decision necessarily implies a holding that there is no legislative mandate binding upon the railroad and upon the Interstate Commerce Commission to incorporate into the icing or refrigerating charge every element which expert and proper bookkeeping might assign to the cost of refrigeration. This we think manifest from the excerpt of the opinion above quoted, and particularly from the phrase therein, " * * * it was immaterial to the carriers whether they were permitted to charge $1.11.2 on the fruit and $12.50 for the ice, or $1.15 on the fruit alone without any distinct charge for transporting

the ice." It also will be observed that in the Atchison, T. & S. F. R. Co. v. U. S., supra, the court was dealing with a freight rate and an icing charge both fixed by the Interstate Commerce Commission as a result of a continuing investigation and not by the carrier, whereas in the case at bar the freight rate and the icing charge were each fixed by the carrier, and the Interstate Commerce Commission has merely required the carrier to extend to this type of perishable freight the same facilities at the same rate which are already charged by the carrier for service for comparable perishable freight, and in effect said to the carrier, "You have established what you consider reasonable rates for the transportation of certain classes of perishable freight comparable to the poultry and dairy products, and we have required you to modify your rules so as to extend to this character of freight the same privileges accorded to similar perishable freight, and also extended by you upon this particular class of freight in all sections of the country other than the six western states."

The rather obvious anomaly of the petitioners contending that an icing charge established by them is unreasonable because in the establishment thereof they ignored a requirement of the law, as they contend, that such charge should include elements which they have excluded and the contention that the Interstate Commerce Commission could not adopt the system which they themselves had adopted in establishing such rates, is met by the petitioners' claim that the icing charges established by them were voluntarily established, and for that reason were permissible, but that, when the Interstate Commerce Commission seeks to force them to accept an inadequate rate, as they claim it to be, it cannot do so without increasing the icing charge to cover expenditures which they themselves had excluded in that charge in applying it to the same perishable freight in other portions of the United States. This argument is based upon the implied assumption that the carrier may disregard the express requirements of the law in establishing such charges, but that the Interstate Commerce Commission is rigidly bound by the same provisions of law which they have disregarded. We can see no merit in this contention. The requirements of section 6 of the Interstate Commerce Act, as amended by section 2 of the Hepburn Act, with reference to separate statement of icing charges, is binding upon the carrier in the establishment of its rates in the first instance. The function of the Interstate Commerce Commission in this regard is to determine whether the rates of a carrier are reasonable. Having selected a system of rates under which the line-haul freight rate must necessarily take care of certain elements of the cost of transportation, they are hardly in a position to now contend that these line-haul freight rates do not cover the cost which they themselves have assigned to it for compensation.

We believe that the icing charge set up by the railroad company on the cost of ice basis was a proper charge under the law, and that the Interstate Commerce Commission, in determining the reasonableness of this charge, had a right to consider the elements of cost which the carriers themselves had assigned to this charge and to ignore other items which the railroads had assigned to the line-haul freight rate. In this statement we do not wish to be understood as holding that the icing charge specified in section 6 of the Interstate Commerce Act, as amended by section 2 of the Hepburn Act necessarily includes the entire cost of refrigeration. As we have said, it may or may not. While the general nature of the charge is indicated by the statute, the details of accounting with reference thereto are left to be determined by the carrier in the first instance, in the absence of rules and regulations of the Interstate Commerce Commission, and in the second instance by the Interstate Commerce Commission as the question arises from time to time. It is our view, therefore, that neither section 6 of the Interstate Commerce Act, as amended by section 2 of the Hepburn Act, nor the decision of the Supreme Court interpretative thereof, or those dealing with the subject-matter, necessarily require that, in the establishment or alteration of rates, the icing charges therein set up must necessarily include all items of refrigerating cost, nor that in considering such an incidental cost the Interstate Commerce Commission is necessarily inhibited from considering the rate to which the charge is ancillary. We arrived at this conclusion by a consideration of the language of the law itself and by an analysis of the decisions relied upon as establishing the rule contended for by the petitioners.

There is, however, an even more persuasive consideration against the adoption of the interpretation of section 6 of the Interstate Commerce Act, as amended by section 2 of the Hepburn Act contended for by the petitioners. To attribute to Congress, in the enactment of section 6 of the Interstate Commerce Act, as amended by section 2 of the

Hepburn Act, an intention to establish a system of accounting so rigid that any failure to apply to each tariff charge every element of cost and profit which in strict and scientific accounting could reasonably be assigned to that charge, would not only completely ignore the fundamental purpose of Congress in the adoption of section 6, that of advising the shipper of the amount he must pay for the transportation of his freight, but would incorporate into the system of rate making a rigidity entirely inconsistent with the powers conferred upon the Interstate Commerce Commission, and would thus introduce into the system rules which would make difficult, if not impossible, the ascertainment of the proper charges to be assigned to the main line freight rate and to each ancillary charge. Instead of clearing a channel for reasonably intelligent rate making, such construction would introduce artificial obstructions in a channel already sufficiently difficult and tortuous. The case at bar illustrates the point in question. It is and must be a matter of opinion as to what portion of the general expense of the common carrier in connection with the moving of perishable freight shall be assigned to the cost of moving the freight and to the cost of refrigeration applicable thereto. It is immaterial in its final results to both the carrier and the shipper as to whether in the gross amount paid by the shipper items of cost are included under one head or another of the charge. The substantial question is the gross amount received and paid. To hold that a rate-making body, in considering the rates upon perishable fruit, cannot look across the boundary line between the main and the ancillary charges to ascertain what the sum of these two shall be, but must examine each separately, would introduce into the rate-making system a complexity wholly unnecessary, and, we believe, a complication incapable of exact solution. This was not contemplated by Congress in requiring a separate charge. It would convert what is intended by Congress for the benefit of the shipper into an obstruction to his efforts to obtain redress before the body established for the very purpose of granting such redress.

 In so far as this question involves the constitutional power of the rate-making body, decisions holding that, in determining the reasonable rate of return for a service rendered, the Interstate Commerce Commission cannot look to other rates on other freight shipped by other people to compensate for the ascertained loss or lack of prof-

it upon the particular transaction involved in the controversy, have no application to the separate charges included in the gross charge required by the carrier from the shipper. If that gross charge provides a compensation for the service rendered, it is immaterial whether the itemization thereof is accurate or inaccurate so far as the constitutional requirement is concerned. We think this conclusion obvious; certainly the decision of the Supreme Court in Atchison, T. & S. F. R. Co. v. U. S., 232 U. S. 199, 34 S. Ct. 291, 58 L. Ed. 568, compels such a conclusion; and the decisions of the Supreme Court in Northern Pac. Ry. Co. v. North Dakota, 236 U. S. 585, 598, 35 S. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; Norfolk & W. Ry. Co. v. Conley, 236 U. S. 605, 35 S. Ct. 437, 59 L. Ed. 745, and Western & A. R. R. v. Pub. Service Comm., 267 U. S. 493, 496, 45 S. Ct. 409, 69 L. Ed. 753, point to that conclusion.

We are therefore concerned here only with the proper interpretation of the statutory regulations of rates and of the authority of the Interstate Commerce Commission.

 The petitioner advances an independent contention with reference to the order of the Interstate Commerce Commission, which may be stated as follows:

Assuming that the Interstate Commerce Commission would have the power upon a petition challenging both the line-haul freight rate and the initial icing charge to consider both in determining whether or not the aggregate afforded reasonable compensation for the service rendered, and that the improper itemization thereof may be ignored where the total rate was sufficient, as was done by the Interstate Commerce Commission in the case considered by the Supreme Court in Atchison T. & S. F. R. Co. v. U. S., 232 U. S. 199, 34 S. Ct. 291, 58 L. Ed. 568, it is claimed that the pleadings and proceedings before the Interstate Commerce Commission in this instance were insufficient to give jurisdiction to the Interstate Commerce Commission to consider a gross charge, but that, by the limitation of the shipper's petition and the evidence in pursuance thereof, the scope of the investigation was limited to the "icing charge" alone, and that thus limited, although the Interstate Commerce Commission found it to be a fact that the stated charge exacted by the carriers was unreasonable, because wasteful and excessive, it could not establish in lieu thereof a new charge which was inadequate for complete refrigeration, although it adopted a charge already fixed by

the railroads for such service. This contention, it seems to us, takes too narrow a view of the allegations of the petition inaugurating the proceedings in question, of the range and scope of the evidence adduced before the Interstate Commerce Commission, and of the powers of the Commission itself and of the procedure in matters pending before the Interstate Commerce Commission. It has been recognized from the first that to require of parties a rigid adherence to the principles of pleading and evidence adopted by the courts would be unreasonable, unnecessary, and unwise, particularly in view of the fact that the Interstate Commerce Commission does not act in judicial, but in a legislative, capacity, and has powers of investigation and supervision inconsistent with the functions of a court. The true rule is that, where an issue is in fact raised and considered by the Commission, and where the parties have had an opportunity to present evidence in support of their contentions with reference to such issues, or are advised of the evidence presented on such issue by their opponent, and advisedly refrained from meeting such evidence, the courts will not inquire into the details of the procedure before the Commission.

The courts are primarily concerned with the question as to whether or not the Commission has constitutional and statutory authority to make the order it had in fact made, and whether in pursuing its authority the interested parties have had their day in court. In examining the proceedings before the Interstate Commerce Commission in view of these principles, it should be observed at the outset that the petitioners therein alleged affirmatively and definitely that the standard refrigerating charge exacted by the shippers of poultry and dairy products in the six western states were wasteful and unreasonable as applied to such products. This charge was amply supported by the evidence. It was found by the Interstate Commerce Commission that the amount of icing required by the standard refrigerating charge was entirely unnecessary, and therefore wasteful, and imposed upon the shipper the burden of paying for a service that he did not need and upon the carrier the performance of services that were wasteful and unnecessary.

We think it unnecessary to state in detail the basis of these conclusions shown by the opinion of the Interstate Commerce Commission in this matter to which we have referred above, except to say that, by reason of the fact that dairy products and poultry are always pre-cooled by the shipper and delivered to the refrigerating car in that condition, the initial icing was in many cases sufficient to take the product to its destination, and in certain months and under certain conditions even that initial icing was unnecessary, if before reaching the warmer climate of Southern California the cars were iced. The shipper, under the cost of ice basis, assumes the responsibility of determining the proper amount of refrigeration, and any loss derived from his incorrect decision in this regard would fall upon the shipper and not upon the carrier, whereas in the stated refrigerating charge loss for lack of refrigeration falls upon the carrier.

We hold, therefore, that the allegations of the petitioner before the Interstate Commerce Commission, attacking as unreasonable the charge for standard refrigeration, and the prayer that in lieu thereof the cost of ice basis already fixed by the carrier should be applied, was fair notice to the carrier that the main-line freight rate, which on a cost of ice basis necessarily carries a portion of the refrigerating charge, was involved in the controversy. In the presentation of the matter before the Interstate Commerce Commission, both parties introduced voluminous testimony with reference to the question of whether or not the line-haul freight rate in the case of the cost of ice basis refrigeration contained a reasonable or sufficient charge to cover the elements of refrigerating cost not covered by the cost of ice basis. In determining that this matter was involved in the proceedings before the Interstate Commerce Commission, we do not overlook the statement of counsel in the argument of the case before the Commission, which is relied upon by the petitioners herein as an admission by the shippers that the line-haul freight rate basis was not involved. We will not attempt to set out the matter in detail, as we would unduly lengthen this opinion. It is sufficient to say that no admission by counsel made at the conclusion of a trial as to the scope of the inquiry, which had been undertaken by the Interstate Commerce Commission and had been in progress for a number of years, could modify the facts that such rates were involved, and were so considered by the parties in the presentation of their evidence. The fact is that the line-haul freight rate was involved to the extent it was necessary that it should be, in a determination of the question of the sufficiency of the gross transportation charge for poultry and dairy products. An admission by counsel to the

contrary would not change the fact nor prevent the Interstate Commerce Commission from passing upon the issues before them. We hold, therefore, that the order of the Interstate Commerce Commission, if otherwise proper, was a legitimate conclusion of the controversy presented to them by the parties thereto. What we have said, however, does not dispose of the complicated situation involved in this controversy.

We have to consider further whether the Commission had the power to render the decision it made. It has two distinct functions with reference to rate making. The first authorized by the Interstate Commerce Act of 1887 (February 4, 1887), namely, that of declaring a rate established by the carrier to be unreasonable, and for that reason nonenforceable, and, second, the power to fix a reasonable rate to supplant the charge or rate held unreasonable. The latter power, so far as applicable here, is stated in section 15 of the Interstate Commerce Act (49 USCA § 15, 41 Stat. 484), as follows:

Section 15, Interstate Commerce Act: "Whenever, after full hearing * * * the commission shall be of opinion that any individual or joint rate, fare, or charge * * * collected by any common carrier * * * or practice whatsoever of such carrier or carriers * * * is or will be unjust or unreasonable * * * the commission is authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare, or charge, or rates, fares or charges to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged * * * and what individual or joint classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any rate, fare, or charge * * * other than the * * * charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed."

The question is, Did the Commission, after holding unreasonable a charge imposed by the carriers, fix in lieu thereof a reasonable and just charge, in view of the fact that it is conceded by the Commission that the charge set aside included a proper element of the cost of refrigeration, and the new charge fixed by the Commission, or, rather, directed to be fixed, omitted that item, because the general line-haul freight rate was sufficient to cover that item. As to that portion of the haul in which the carriers had themselves established a cost of ice basis looking to the line-haul freight rate for compensation for haulage of ice, etc., there certainly could be no impropriety in the Commission's fixing a new icing rate which raised or lowered the cost of ice per ton as fixed by the carriers, regardless of the elements of cost of refrigeration theretofore omitted by the carriers when they fixed the cost per ton. The rate fixed by the carrier was for the service rendered, that is, putting the ice in the bunkers, and the charge fixed by the Interstate Commerce Commission, in lieu thereof, must, or should, be for that same service. On the other hand, where the stated charge basis for refrigeration is the charge under review, can the Commission fix a substituted charge therefor which does not cover an admitted item of the cost of that service theretofore included therein by the carrier because of the fact that the freight rate imposed upon the product is unreasonably high or sufficiently high to cover these items adequately? There is a primary difficulty in this matter. The line-haul freight rate on poultry and dairy products is imposed, regardless of whether or not the shipment is refrigerated, or the nature or extent of that refrigeration. During certain seasons of the year, some or all of these products are shipped without refrigeration. One of the witnesses, Mr. Ford, testifies on that subject as follows:

"Q. What are the facts as to the amount of ice required for the several commodities involved throughout the year? A. Dressed poultry is iced and reiced throughout the year, there being some variation in the amount of the icing. Precooled shipments of butter are iced only in the heated season, not more than 6 months at the outside. Carload shipments of eggs are iced during a period of 4 to 5 months only. Cheese is iced during about 3 months in the year, only during the extreme heated season.

"Therefore, if there were a stated refrigeration charge to be applied to every one of those commodities throughout the year, the consumer would necessarily be paying for this service when no refrigeration is necessary. That was the situation under the set of graduated refrigeration charges maintained on dairy products until they were disapproved by the Commission in case 7969 [Na-

tional Poultry, Butter & Egg Ass'n v. Baltimore & O. S. W. R. Co.], 51 I. C. C. 34.

"Q. That covered Official Classification territory, only, did it not? A. It did. The charges applied the year around, whether or not any ice was used. This deprived the shipper and the public of the economies that might have been effected during the period when icing was not necessary or only a small amount was necessary. If a fixed and definite refrigeration charge is established, it will simply in the long run add that much to the cost of the food products.

"The same amount of ice and the same degree of refrigeration is not required on all products. There is a great variation in the amount of refrigeration necessary, as between dressed poultry and butter and eggs. For butter and eggs no salt is necessary and, consequently, the consumption of ice is very much less than it is where a percentage of salt is used. The economies in the use of ice are now effected by the orders given with respect to the amount of ice to be furnished. Those economies would be lost to the shipper and the public under a stated refrigeration charge."

It therefore appears that, if the line-haul freight rate is sufficiently high to absorb the ice haulage charge and other refrigerating charges not covered by the cost of ice basis over and above a reasonable rate for the haulage of the freight, it is too high, and should be reduced accordingly, and all the shippers of these products, whether refrigerated or not, will share in the benefit. In this regard the situation is analogous to that discussed in the Stickney Case, supra, and wholly distinct from that in the Atchison, T. & S. F. R. Co. v. U. S., 232 U. S. 199, 34 S. Ct. 291, 58 L. Ed. 568, supra. The Interstate Commerce Commission answers this proposition by the contention that the carrier cannot be heard to assert that, under the findings, the rate upon shippers of nonrefrigerated poultry and dairy products is excessive. But that does not meet the situation, because the essence of the petitioners' claim is that the Interstate Commerce Commission has not regularly pursued its statutory authority in fixing the rates that it did fix, and its argument, based upon the failure to reduce such charges on unrefrigerated products, is merely to enforce its contention that it is essentially wrong to look to a line-haul freight rate to supplement an auxiliary charge when that auxiliary service is not uniformly utilized. In other words, that the line-haul rate under consideration by the Interstate Commerce Commission is not a charge on refrigerated products alone, as in

the precooling case, Atchison T. & S. F. R. Co. v. U. S., 232 U. S. 199, 34 S. Ct. 291, 58 L. Ed. 568, supra, but a charge also applicable to unrefrigerated freight. The statute applicable (section 15 of Interstate Commerce Act, supra) seems to be perfectly clear and definite. The Interstate Commerce Commission has power to prohibit an unreasonable rate and to substitute a reasonable rate for the same service. The rate set aside included ice haulage, etc., and the substituted service did not compensate for these costs, as every reasonable rate must.

This brings us to a more detailed consideration of the charge in question. In that regard we quote from the brief filed on behalf of the Interstate Commerce Commission as follows:

"The evidence of record before the Commission shows that the initial lines retain all of the stated charge, and pay their connections only upon the cost-of-ice basis, the basis which exists on identical traffic originating east of the Rocky Mountains and which the Commission has here prescribed on shipments originating in the six westernmost states.

"In this connection we first call attention to rule No. 238 of Supplement No. 64 to National Perishable Freight Committee Tariff I. C. C. No. 1, effective July 23, 1926 (at the time of the hearing before the Commission), and which has been continued in force in later tariffs up to the present time. The rule reads as follows:

" 'The entire stated refrigeration revenue (except as provided in Paragraph ("B"), also charges provided under Rules Nos. 215, 230, 240, 244, 245 and 250, will be credited to the carrier handling the shipment from the point from which such charges are first applicable.'

"This rule is referred to in the testimony of Mr. Ford at page 398 of the record before the Commission.

"The following appears in the testimony of Mr. Nelson, a witness for the carriers, at page 1024 of the record.

" 'Q. Mr. Nelson, I think the record shows that under the provisions of the tariff the entire refrigeration revenue accrues to the originating carrier, with certain exceptions which I think are not material here. Is that a fact? A. As far as the stated refrigeration charges are concerned, they accrue to the initial carrier.

" 'Q. So if a car originated on the Santa Fe in California and moved to a destination on the Atlantic seaboard the entire revenue

from the stated charge would accrue to the Santa Fe? A. It would.

" 'Q. I take it that as to icings which are beyond your line, so-called foreign line icings, that you are required to pay to the foreign lines the cost of ice furnished, figured at section 4 rates? A. Correct.'

"In other words, the situation indicated by this testimony, and the tariff rule, is that out of the elements which make up the stated charge basis, namely:

"1. Cost of ice furnished;

"2. Hauling the ice placed in the bunkers of the refrigerator cars;

"3. Switching cars to and from stations for the purpose of placing ice in the bunkers;

"4. Repairs to the refrigerating devices of refrigerator cars;

"5. Supervision;

—the initial carriers pay their connecting lines only for items 1 and 3, namely, cost of ice furnished and switching cars to and from stations for the purpose of placing ice in the bunkers. This is true notwithstanding the fact that the carriers showed to the Commission in this case, that a large percentage of the stated refrigeration charge consists of the haulage of the ice in the bunkers. Thus, it comes about that all of the carriers, except the initial western carriers, have been and are being paid upon the cost-of-ice basis only. The compensation of said carriers has not been changed by one cent by the order of the Commission, and it certainly can not be asserted that they have suffered any damage. Certain examples of this situation are shown by the exhibits of record.

"It is claimed by the Santa Fe Railroad in its exhibit No. 146 that it costs the Santa Fe Railroad $42.38 per car for hauling ice used in the refrigeration of dairy products. At page 3 of Exhibit No. 146, we find that a car originated on the Santa Fe in or around San Francisco, and moved via Roseville, Calif., Sparks, Nevada, Carlin, Nevada, Ogden, Utah, Laramie, Wyoming, North Platte, Nebraska, and Council Bluffs, Iowa. This is the route of the Southern Pacific, Union Pacific, and Chicago & North Western as far as Chicago. The exhibit does not show at what point the Santa Fe turned this car over to the Southern Pacific; but be that as it may, the Santa Fe uses this car and uses the ice haulage incurred in connection therewith in justification of its stated charge of $85. The Santa Fe Railroad received all of the stated charge on that car. When that car was turned over to the Southern Pacific, it went

on the cost-of-ice basis in so far as the revenues of the Southern Pacific and all lines east were concerned. The Southern Pacific hauled the ice from the point where the Santa Fe interchanged it to Ogden; the Union Pacific from Ogden to Council Bluffs; and the Chicago and North Western from Council Bluffs to Chicago. The Santa Fe Railroad did not haul the ice in the bunkers of that car more than thirty miles. For that ice haulage the Santa Fe is claiming $45.18, the alleged cost of hauling ice from origin of the car to Buffalo or Detroit. We think it important to direct the attention of the court to the fact that the Santa Fe did not perform the service of hauling the ice from point of origin to Buffalo or Detroit, and the connecting lines, which performed the service, were never paid for it, except in the line-haul rates.

"Page 5 of the Northern Pacific Exhibit shows a similar situation. Five cars moved from Spokane, Wash., to Crete, Nebr., and were turned over to the C., B. & Q. at Billings, approximately halfway. In this exhibit, the Northern Pacific is urging in justification of the refrigeration charge which it retained in its entirety, the fact that it cost $17.38 to haul the ice 2,000 miles. The Northern Pacific did not haul the ice 2,000 miles; it only hauled it half that distance. The Burlington received only its line-haul rate plus the cost of ice under section 4 of the tariff. The last page of the Northern Pacific Exhibit is also instructive. The page shows 87 cars moved an average distance of 3,227 miles. In justification of the stated charge, the Northern Pacific claims that it costs it $37.97 to haul 10,000 pounds of ice 3,227 miles. It performs no such service. It hauls the ice to St. Paul, a little over half the distance, and paid not one cent to any one for hauling the ice beyond. Similar illustrations in the other exhibits of the carriers could be shown.

"If this arrangement as to ice haulage were a reciprocal one, with perishable traffic moving in both directions, an argument advanced by the carriers to justify the practice might be sound. If the New York Central originated a substantial amount of perishable traffic moving to a point in Washington, it might be merely a simplification of bookkeeping to allow each originating carrier to retain the full stated charge on the theory that the ice haulage performed by each carrier would amount to a reciprocal service by each carrier for the other which would be approximately equal. But here the tonnage is approximately 100 per cent in one

direction. On traffic from the Pacific Coast to New York, the western lines always originate the traffic. The Burlington, the North Western, the Missouri Pacific or the eastern lines always haul the ice, and not only does no one pay them for hauling the ice, but no western line hauls any ice for them in compensation.

"Upon this subject the Commission made the following finding at page 265 of its report in this case:

" 'It is of interest to note that on transcontinental shipments of dairy products, under refrigeration, from the six westernmost states, the stated charges are not divided, as are freight charges, between the initial carrier and the other carriers forming the through route, but the initial carrier receives the stated charge and pays its connections for the actual weight of ice loaded at stations on their lines, with a minimum of 1,000 pounds per loading, at the rates stated in section 4 of the perishable protective tariff. This is not without significance in view of the fact that the eastern connections referred to, and in fact the initial carriers themselves, maintain the cost-of-ice basis on shipments of the same commodities originating east of the six westernmost states.'

"From what has been said, it is obvious that none of the carriers complainant in this case, other than the Atchison, Topeka and Santa Fe; Chicago, Milwaukee, St. Paul and Pacific; Great Northern and Northern Pacific, have suffered, now suffer, or could possibly suffer, any pecuniary damage, and that said petitioners are not representative either of the other petitioners named in the bill, or of all the defendants before the Commission, as a class. The petition should, therefore, be dismissed as to all of the petitioners, except those above named, for the reason that they have utterly failed to prove any damage to them arising from the Commission's order. The remaining railroads are the only carriers which receive any compensation for refrigeration above, or in excess of the cost-of-ice, or section 4, basis prescribed by the Commission; they are the only ones who are in any position to contend here for the retention of charges which they justify by reference to a service which they do not perform, and which they admit they do not perform."

This statement of the facts is sufficiently accurate to present the question we will now consider. The fixing of the icing charge on a cost of ice basis on refrigerated poultry and dairy products, as directed by the Interstate Commerce Commission in its order, is in strict conformity with the present practice of all the railroads involved except as to shipments originating on their own lines within the six western states, to the end of their own lines at the point of delivery to a connecting carrier. The connecting carrier charges on the cost of ice basis even if a part of the haul is in these states, consequently the only costs that are included in the stated charge and excluded from the cost of ice basis are the items of ice haulage, supervision, bunker repair, and profit of the initial carrier over his own lines to the point of delivery to the connecting carrier. In this statement we assume, as the Commission found to be the fact and is obviously true, that in setting up the cost of ice basis the carriers look to the line-haul freight rate for compensation for all other charges involved in refrigeration. This was proper, and, as we hold, the Interstate Commerce Commission could follow the same distribution of costs of refrigeration. But, where a stated charge is set up and replaced by a cost of ice basis, the Interstate Commerce Commission must absorb the cost theretofore properly absorbed by the stated charge, and in this connection it may be well to repeat what has already been implied, namely, that at present the stated charge involves a double payment by the shipper for the items included in the stated charge and excluded in the cost of ice basis, so far as the freight is carried on connecting carriers.

This leads us to this conclusion: That the order of the Interstate Commerce Commission is valid in so far as it prohibits the carriers from collecting the stated icing charge, because such charge is unreasonable and unjust; that the order is valid in so far as it requires an icing charge to be set up and published and charged that will be on the cost of ice basis at present rates per ton for ice on all connecting carriers; that the order is invalid only in so far as it directs the initial carrier in the six western states to publish a tariff on a cost of ice basis for refrigeration at the present rate per ton for ice, which rate thus established excludes from the cost of refrigeration the hereinbefore mentioned cost of ice haulage, etc., over its own lines to the point where the car is delivered to its connecting carrier or to the point of delivery on its own lines if within said six westernmost states, for the reason that the rate fixed by the Interstate Commerce Commission for that portion of the service rendered by the carrier is not a just and reasonable rate within the meaning of that term as used in section 15

of the Interstate Commerce Act, supra, in that the rate displaced covers the cost of ice haulage, etc., as aforesaid, over its own lines as aforesaid, and the new rate, although it requires ice haulage, etc., to be furnished over its own lines as aforesaid, does not provide compensation therefor. The per ton rate for ice for the initial carrier, if icing rates are fixed on the cost of ice at a per ton rate basis, should absorb these items over its own lines only to the point of delivery within the six western states or to the connecting carrier, or an additional charge should be set up to provide such compensation. In the new rate upon the cost of ice basis, the initial railroads should be permitted to absorb these omitted items in its icing charge over its own lines in the rate to be fixed by it either under the direction of the Interstate Commerce Commission in the proceedings already instituted or the rate should be fixed therein by the Interstate Commerce Commission so as to absorb the aforementioned omitted items. Our injunction will merely go to the point that the Interstate Commerce Commission is enjoined from enforcing the present ice per ton rates now fixed for icing by the published railroad tariffs, in so far as such rate applies to the initial shipper for refrigeration over its own lines to the point at which it delivers freight to the connecting carrier, or to a point of delivery within the six westernmost states. This order is without prejudice to any further proceedings for the fixing of the icing charge or the reduction of the line-haul freight rate on poultry and dairy products either in the present or in newly inaugurated proceedings before the Interstate Commerce Commission. We find that the rates fixed by the Interstate Commerce Commission are not confiscatory; that such rates do not violate the Constitution of the United States, and are just and reasonable in all respects, with the exception hereinbefore mentioned, namely, that the Interstate Commerce Commission has failed to regularly pursue its statutory authority in the fixing of the new rate, for the reason that the new rate does not include the cost of the service rendered by the initial carrier and reasonable profit thereon, as aforesaid, as does the displaced rate, and for that reason only, and to that extent only, the order is invalid, because the Interstate Commerce Commission has not complied with the statute giving them authority to fix rates that are just and reasonable in lieu of rates declared by them to be unreasonable and unjust.

Findings will be prepared in accordance with this opinion.